H. Jonathan Rubinstein (042341992)
THE FEINSILVER LAW GROUP, P.C.
215 Millburn Avenue
Millburn, New Jersey 07041
Tel. 973-376-4400
Fax. 973-376-4405
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

———————————————————X     Case No.

MICHAEL MCGRATH, as Trustee of the Michael
R. McGrath Revocable Trust, SAUMYA SHAH
AND MONALI SHAH, as Trustees, of the
Saumya Shah Trust; RICKY A. DASHEFSKY, as
Trustee of the Ricky A. Dashefsky Revocable
Trust; TIMOTHY LARSEN; BEAR FOLEY LLC;
WILLIAM R. ROSSI; GARY WARNESS, as
trustee of the Gary Jon Warness Revocable Trust;
JEFF LAPIETRA, as trustee of the Jeffery S.
Lapietra Revocable Trust; RODNEY SNYDER;
MICHELE SNYDER; IDOKO SALIFU; DIN
PROPERTIES LLC; JEFFREY JOHNSON, as
trustee of the Jana L. Johnson Revocable Trust;
GISIM PROPERTIES, LLC, JOEL GROSHONG,
BARRETT WINDISH, and HERRERA &
SAENZ PROPERTIES, LLC.

                                         Plaintiffs,

                - Against -                                    **JURY TRIAL DEMANDED**

FIRST NATIONAL REALTY PARTNERS LLC;
FIRST NATIONAL REALTY ADVISORS, LLC;
FIRST      NATIONAL      PROPERTY
MANAGEMENT LLC, ANTHONY GROSSO,
CHRISTOPHER    PALERMO,    JARED
FELDMAN, ANDREW DENARDO, KURT
PADAVANO,    BILL    COMEAU,    FRED
BATTISTI, JR., and MICHAEL HAZINSKI.

                                         Defendants.

———————————————————X

## **COMPLAINT**

1

MICHAEL MCGRATH, as Trustee of the Michael R. McGrath Revocable Trust; SAUMYA SHAH AND MONALI SHAH, as Trustees, of the Saumya Shah Trust; RICKY A. DASHEFSKY, as Trustee of the Ricky A. Dashefsky Revocable Trust; TIMOTHY LARSEN; BEAR FOLEY LLC; WILLIAM R. ROSSI; GARY WARNESS, as trustee of the Gary Jon Warness Revocable Trust; JEFF LAPIETRA, as trustee of the Jeffery S. Lapietra Revocable Trust; RODNEY SNYDER; MICHELE SNYDER; IDOKO SALIFU; JOEL GROSHONG, DIN PROPERTIES LLC; JEFFREY JOHNSON, as trustee of the Jana L. Johnson Revocable Trust; GISIM PROPERTIES, LLC, JOEL GROSHONG, BARRETT WINDISH, HERRERA & SAENZ PROPERTIES, LLC (collectively "Plaintiffs"), by and through their attorneys, respectfully submit this Complaint against ANTHONY GROSSO, CHRISTOPHER PALERMO, JARED FELDMAN, ANDREW DENARDO, KURT PADAVANO, BILL COMEAU, FRED BATTISTI, JR., MICHAEL HAZINSKI, (collectively the "Individual Defendants"), FIRST NATIONAL REALTY PARTNERS LLC, FIRST NATIONAL REALTY ADVISORS, LLC, FIRST NATIONAL PROPERTY MANAGEMENT LLC, ANTHONY GROSSO, CHRISTOPHER PALERMO, JARED FELDMAN, ANDREW DENARDO, KURT PADAVANO, BILL COMEAU, FRED BATTISTI, JR., MICHAEL HAZINSKI (collectively "Defendants") and respectfully allege as follows:

## **NATURE OF THE CASE**

1.      This action is brought pursuant to the state and federal securities laws, Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO")[1], and other referenced law, against the Defendants named herein, for Defendants' wrongful and unlawful conspiracy, and systematic pattern of deception and fraud in connection with Defendants' marketing

---

[1] Defendants are included in this action independently and as RICO Association-In-Fact Enterprises. See 18 U.S.C. §§ 1961-1968.

and sale to Plaintiffs of shares in various LLCs (the "LLCs"),[2] which purchased large-scale commercial properties for investment (the "Underlying Properties").

2. Defendants' conspiracy to defraud Plaintiffs with respect to their investments in the LLCs permeated every aspect of Defendants' interactions and business dealings with Plaintiffs, as well as the financials for the Underlying Properties and the LLCs. From the start, Defendants employed sophisticated, unconscionable, and abusive phone-tactics that preyed upon investors seeking investment returns, like Plaintiffs.

3. Defendants, upon information and belief, then maliciously and willfully conspired to defraud Plaintiffs and violate RICO, and Securities and Exchange Commission ("SEC") Regulations by, amongst the plethora of other reasons discussed herein:

> (i) **paying illegal commissions to their salespersons** in violation of SEC Regulation D;[3]

> (ii) **overvaluing the Underlying Properties** in order to fraudulently abscond with the difference in price between the amount that Plaintiffs invested in each Underlying Property and the lesser price Defendants actually

---

[2] The LLCs for which Defendants sold shares in to Plaintiffs included:

> Bishops Corner SC Realty Fund, LLC Brandywine Crossing Realty Fund LLC, Sand Hill Plaza SC Realty Fund LLC, Sand Hill Plaza SC TIC 4 Member LLC, Southland Crossings Realty Fund LLC, SS Tulsa Center Realty Fund LLC, Champions Village Realty Fund LLC,  PC Center Realty Fund LLC, CS Center Realty Fund LLC, Tropicana Centre LV Realty Fund LLC, Maple Park SC Realty Fund LLC, Maple Park SC TIC 2 Member LLC, Maple Park SC TIC 9 Member LLC; Inverness Corners SC Realty Fund, LLC, Inverness Corners SC TIC 10 Member LLC, Northeast Plaistow Fund, LLC; MW Centers Realty Fund LLC; CRS Center Realty Fund, LLC; Series 2 First National Realty Partners Fund IV , LLC; Series 4 First National Realty Partners Fund IV, LLC; Mid-America Grocery SC Realty Fund, LLC; Brook Highland SC Realty Fund, LLC; Tannehill Realty Fund LLC; Grayhawk SC Realty Fund LLC, Grayhawk SC TIC 4 Member LLC, Davenport MF Realty Fund LLC, Dauphin Plaza Realty Fund LLC, Manassas SC Realty Fund LLC, Heritage Park SC Realty Fund, LLC, HH Center Realty Fund LLC, TP Center Realty Fund LLC, Village at Pitt Mills Realty Fund LLC, Cristina Crossing SC TIC 8 Member LLC, Cristina Crossing SC TIC 11 Member LLC, Maples Park SC TIC 11 Member LLC, Inverness Corners SC TIC 4 Member LLC, Summerdale Plaza Realty Fund, LLC, and Dauphin Plaza TIC 3 Member LLC (collectively, the "LLCs").

[3] Defendants violated SEC Reg D  by selling private placement securities without a broker-dealer license while paying Defendants' employees and salespersons *transaction-based compensation*, and also by trying to circumvent SEC Reg D and illegally paying Defendants' employees and salespersons  *transaction-based compensation* under the guise of a bonus pool.

paid for each Underlying Property and to inflate fees charged by Defendants that were calculated based upon the value of the property;

   (iii) **making unauthorized transfers and distributions** to themselves and companies they own and **commingled funds,** and using other related-entities to **siphon funds from the Underlying Properties**; and

   (iv) **fraudulently skimming from Plaintiffs <u>more than half</u> of the returns from the Underlying Properties** by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false.

<u>See</u> Dr. Craig McCann, SLCG Economic Consulting: *First Realty Partners Reg D Offerings: Muppets Do Commercial Real Estate* at 3-4 *(the "Dr. McCann Article")* (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann) (showing an example Defendants scheme and Cash Distributions Chart concerning Defendants' purchase of and financial accounting for Defendant LLC –*Maple Park SC Realty Fund LLC* ("Maple Park") – and concluding that "**FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself**.") <u>Contra</u> *FNRP's Marketing and Sales Materials*, https://fnrpusa.com/fnrp360/ (FNRP video where Defendants falsely state that Defendants "secure properties both on-market and off-market, at or below market value . . . ); <u>infra</u>.[4]

4.      Defendants continued to fraudulently induce Plaintiffs to make their investments in the LLCs <u>by conspiring to fraudulently *misrepresent* to Plaintiffs that</u>:

   (a)  Defendants had completed all of their *due diligence* respecting their purchases of the Underlying Properties;

   (b)  the Underlying Properties required no significant, material improvements before they could be occupied for profit and resold by Defendants (with a significant payout to Plaintiffs);[5]

---

[4] Several of the Plaintiffs herein were sold by Defendants shares in the Maple Park investment.
[5] Defendants also deceived Plaintiffs and other investors in a video on their company website describing the due diligence that Defendants' supposedly perform on every investment deal, where RICO-Defendant FNRP falsely claimed that, before every purchase of an investment property by Defendants: "*we have a Strike Force . . .[and] we turn over every stone we can prior to closing on an*

(c)  Plaintiffs would receive consistent, cash distributions from the Defendant LLCs of 6% or greater annually;[6] and

(d)  Defendants had used ***fixed***-*interest* financing to purchase the *Underlying Properties*.[7]

(e)  Average Annual Investor Returns were between 12% and 18%, despite no reasonable basis for make such a representation either based upon past returns or any reasonable belief in the likelihood of future returns in such range.[8]

5.    In reality and unbeknownst to Plaintiffs, Defendants were able to make each of the Underlying Properties *appear* like a profitable investment because Defendants had defrauded Plaintiffs by presenting financial projections based on inflated valuations of the properties, that resulted in false cap rates, and, in certain cases, used assumptions about fixed-interest rate loans when Defendants knew the properties were financed at variable rates that would likely increase substantially after the time of acquisition.  After Defendants extracted their excessive fees and markups, Plaintiffs were left with shares in companies that did not – *and could not* – produce proper distributions to Plaintiffs, or be sold for profit.

6.    For instance, approximately two to three years ago,  <u>Defendants purchased the Underlying Property – *Summerdale Plaza Realty Fund LLC* ("Summerdale Plaza") for approximately **$17.25**</u>

---

*asset to make sure there are no surprises once we close.*" See <u>https://fnrpusa.com/fnrp360/</u>

[6] Defendants have attempted to hide their conspiracy to defraud Plaintiffs by, amongst the other ways discussed herein, using a program called "*Deal Room*," which enabled Defendants to make presentations to Plaintiffs regarding the LLC investments, and then covertly take-back all of the documents they produced in those presentations. However, Plaintiffs have maintained certain of those presentations which consistently tout inflated returns.

[7] Defendants have attempted to hide their conspiracy to defraud Plaintiffs by, amongst the other ways discussed herein, using a program called "*Deal Room*," which enabled Defendants to make presentations to Plaintiffs regarding the LLC investments, and then covertly take-back all of the documents they produced in those presentations. <u>See</u> <u>infra</u>.

[8] Vanguard's REIT index fund which tracks US traded REITs has had an 8.1% annualized return over the past 25 years.  Based upon the fees and costs associated with FNRP's business model, it could not reasonably expect to deliver investors returns of more than 3% to 4% per year on average.

**Million**, and Defendants sold shares to investors in *Summerdale Plaza*. Repeatedly, Defendants touted to Plaintiffs and other investors that the *Summerdale Plaza* investment was a stabilized, extremely conservative investment. On February 6, 2025, however, Defendants informed investors that <u>Defendants sold *Summerdale Plaza* for approximately **$15 Million**</u> –<u>a **loss** for investors of approximately 60% on their investments in *Summerdale Plaza*</u>, which, upon information and belief, stems from Defendants' skimming from the Summerdale investment.[9]

7.    To further help accomplish their scheme, Defendants unilaterally designated themselves as the asset manager for the LLCs (the "Asset Manager"), and also as the sole realtor respecting commercial-tenant deals in the Underlying Properties (the "Sole Realtor"). Then, Defendants conspired to fraudulently and include provisions in the Purchase Documents that blocked Plaintiffs' right to remove Defendants from those posts. Thus, Defendants were able to continue their wrongful conspiracy – unfettered – and further defraud Plaintiffs and deplete the assets of the LLCs.[10]

8.    With Defendants now holding this self-imposed, "Golden Ticket" as the <u>Asset Manager,</u> the <u>Sole Realtor,</u> and <u>Owner</u> of the LLCs (a textbook conflict-of-interest), Defendants conspired to fraudulently manage the Underlying Properties, which enabled Defendants to wrongfully collect from Plaintiffs and the Defendant LLCs: (a) millions of dollars in fraudulent fees and other charges – disguised as payments for services to various Defendant-owned companies; and (b) unreasonable,

---

[9] <u>See</u> *Dr. McCann Article* at 3 (attached hereto as Exhibit 1, with the Curriculum Vitae of Dr. McCann ). Plaintiffs will seek discovery in this case to determine how Defendants' could allow such a massive loss to possibly occur with respect to an investment that Defendants purported to Plaintiffs was a "*stabilized, extremely-conservative investment*."

[10] Pursuant to the provisions of the Purchase Documents, removal of Defendant FNRA as the Asset Manager requires unanimous consent of every Defendant LLCs. To block Plaintiffs and the other investors from being able to accomplish this, Defendants paid $1 to make themselves a voting LLC. With Defendants as a voting LLC, unanimous consent to remove Defendant FNRA as the Asset Manager of the Defendant LLCs became impossible for Plaintiffs.

self-serving commissions and tenant-lease fees and costs.[11]

9.      For instance, Defendants conspired to secretly form a construction arm of their business (under the guise of being separate from Defendants) where, even though Defendants supposedly completed all of their "due diligence" prior to purchasing the Underlying Properties, Defendants' conspired to fraudulently charge the Defendant LLCs millions of dollars for excessive and unreasonable construction-work and material improvements on the Underlying Properties – which significantly depleted the assets of the LLCs and Plaintiffs' investments and distributions.[12]

10.     Moreover, Defendants misrepresented in *Asset Management Agreement* ("AMA") provided to Plaintiffs in connection with the investment that Defendants would (a) make available for inspection detailed business and accounting records of the LLCs, (b) seek bids of all contracts in excess of $50,000, (c) refrain from purchasing goods or services, or otherwise dealing with, affiliates of the assets manager for amounts above market rates; and (d) gain approval for material expenditures outside those contemplated in the LLC operating agreements, as required by the AMA.

11.     Defendants' deceptive and fraudulent misconduct in this case, abusive methods of solicitation, and misrepresentations and omissions of material facts with respect to Defendants' wrongful conspiracy to market and sell to Plaintiffs shares in the LLCs and to manage the

---

[11] One egregious example of Defendants entering into a self-serving tenant-lease deal is the 2024 lease agreement between Defendant Maple Park Place LLC and tenant Five Below, which Defendants executed and from which Defendants earned substantial commissions and fees. Plaintiffs believe that discovery will show considerable other ways that Defendants wrongly collected fees from the Underlying Properties and conspired to defraud Plaintiffs, including Defendants setting up and using other related entities to wrongfully collect fees from the Underlying Properties and the Defendant LLCs. See infra.

[12] In this regard, Defendants either: (a) fraudulently held out to Plaintiffs – at the time of Plaintiffs' investments – that Defendants had completed all of their due diligence respecting their purchase of the Underlying Properties (and that the Underlying Properties were in good, working order) or (b) fraudulently held out to Plaintiffs – after Plaintiffs' made their investments in the Defendant LLCs – that Defendants' construction company was required to charge the Underlying Properties and Plaintiffs millions of dollars to work on multiple, material improvements for the Underlying Properties.

Underlying Properties, as described herein, violate RICO, the New Jersey Racketeering Act, and state securities laws, and the other laws referenced herein. Each separate sale, commission earned, misrepresentation, and/or illegal act by Defendants constitutes a separate violation state securities laws and a separate act of fraud.

12.     By way of this action, pursuant to RICO, the New Jersey Racketeering Act, state securities laws, and other applicable law, Plaintiffs seek to: (i) rescind their investments in the various LLCs that the Defendants conspired to unlawfully market and sell to Plaintiffs; (ii) force Defendants to disgorge all monies wrongfully collected, directly and indirectly, from Plaintiffs in this case, including: (a) the amounts that Plaintiffs invested in the LLCs, and (b) all acquisition and other fees, and commissions, wrongfully collected by Defendants; and (iv) recover actual damages in the amount of at least **$9,430,742.12**, plus *automatic* treble damages under 18 U.S.C. § 1964(c), triple actual damages pursuant to the New Jersey Racketeering Act, consequential damages, exemplary damages, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs of suit.

13.     Because Defendants' illegal conspiracy to defraud Plaintiffs was committed by Defendants in this case with willful and malicious intent to injure and damage Plaintiffs, and with wanton, willful, and reckless disregard for Plaintiffs' legal rights, and because Defendants' wrongful conspiracy allowed Defendants to siphon tens of millions of dollars from Plaintiffs and the Defendant LLCs, Plaintiffs also seek an award of punitive damages  of five times actual damages pursuant to the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9 *et seq.*.

**JURISDICTION AND VENUE**

14.      This Court has original subject-matter jurisdiction over the claims based upon RICO and Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, pursuant to 29 U.S.C. §1331, 18 U.S.C. §1964, and 18 U.S.C. §§1961 *et seq.*

15.      In addition, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

16.      Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C § 1391(a) because at all relevant times at least one Defendant resided, was found, had agents, and/or conducted business in this District. In addition, at all relevant times, Defendants maintained a corporate office in this District, Moreover, a substantial part of Defendants' wrongful and unlawful acts and omissions to Plaintiffs occurred in this District.

## PARTIES

17.      Plaintiff Michael McGrath, Trustee of the Michael R. McGrath Revocable Trust (Dated April 19, 2021) is domiciled in Florida. The Plaintiff invested $100,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in LLCs).

18.      Plaintiffs Saumya Shah and Monali Shah, Trustees of the Saumya Shah Trust Dated August 10, 2021 are domiciled in Illinois. The Plaintiffs invested $350,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in LLCs).

19.      Plaintiff Ricky Dashefsky, Trustee of the Ricky A. Dashefsky Recovable Trust, is domiciled in Florida. The Plaintiff invested $516,584 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

20.     Plaintiff Timothy Larsen is domiciled in Utah. The Plaintiff invested $85,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

21.     Plaintiff Bear Foley, LLC is a limited liability company organized under the laws of the State of New Hampshire and its member Wayne Barrows is domiciled in New Hampshire. The Plaintiff invested $100,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

22.     Plaintiff William Rossi is domiciled in New Jersey. The Plaintiff invested $50,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

23.     Plaintiff Gary Warness, Trustee of the Gary Jon Warness Revocable Trust is domiciled in Virginia. The Plaintiff invested $250,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

24.     Plaintiff Jeffrey Lapietra, Trustee of the Jeffrey S. Lapietra Revocable Trust is domiciled in Illinois. The Plaintiff invested $425,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

25.     Plaintiffs Rodney and Michele Snyder are domiciled in Illinois. The Plaintiffs invested $50,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in LLCs).

26.     Plaintiff Idoko Salifu is domiciled in New York. The Plaintiff invested $750,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

27.     Plaintiff DiN Properties, LLC is a limited liability company organized under the laws of the State of Texas and its member Nick DiNardo is domiciled in Indiana. The Plaintiff invested $375,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

28.     Plaintiff Jeffrey Johnson, Trustee of the Jana L. Johnson Revocable Trust is domiciled in Minnesota. The Plaintiff invested $800,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

29.     Plaintiff GISIM Properties, LLC is a limited liability company organized under the laws of the State of Pennsylvania and its member Simeon Gomelsky is domiciled in Pennsylvania. The Plaintiff invested $300,000.00 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

30.     Plaintiff Joel Groshong is domiciled in Mississippi. The Plaintiff invested $3,905,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

31.     Plaintiff Barrett Windish is domiciled in Florida. The Plaintiff invested $240,000 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

32.     Plaintiff Herrera & Saenz Properties, LLC is a limited liability company organized under the laws of the State of California and its members Luis Herrera and Evelyn Saenz are domiciled in California. The Plaintiff invested $1,284,157.72 in the LLCs (see infra, Chart showing Plaintiffs' investments in the LLCs).

33.     Defendant First National Realty Partners, LLC ("FNRP") owns and/or controls the other Defendant LLCs and is a limited liability company with over $2 billion in assets, organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey.

34.     Defendant First National Realty Advisors LLC ("FNRA") is the asset manager for the LLCs, and is a limited liability company organized under the laws of the State of Delaware, with

its principal place of business located in Red Bank, New Jersey. According to offering memoranda prepared by Defendants, FNRA is controlled by Defendants Anthony Grosso and Christopher Palermo and is an affiliate of FNRP. Upon information and belief, FNRA is a subsidiary of FNRP.

35.     Defendants First National Property Management, LLC ("FNPM") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. FNPM employed certain of the salespersons who solicited Plaintiff's investments.  Upon information and belief, FNPM is a subsidiary of FNRP.

36.     Defendant Anthony Grosso is the owner, managing member, and a head decision maker for Defendants FNRP, FNRA, and FNPM.  Upon information and belief, Defendant Grosso is a resident of the State of New Jersey.  Moreover, he is a RICO conspirator in this lawsuit (along with the other individual Defendants and the RICO Enterprises Defendants FNRP, FNRA and FNPM) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants' sale to Plaintiffs of shares in the LLCs. Mr. Grosso is also a control person pursuant to the various applicable securities laws.  According to private placement memoranda prepared by Defendants, Mr. Grosso "leads the firm's investment team and is responsible for all investing, asset management, and finance functions, along with overseeing strategic direction."  Upon information and belief, Mr. Grosso was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

37.      Defendant Christopher Palermo is the owner, managing member, and a head decision maker for Defendants FNRP, FNRA, and FNPM.  Upon information and belief, Defendant Palermo is a resident of the State of New Jersey.  Moreover, he is a RICO conspirator in this lawsuit (along

12

with the other individual Defendants and the RICO Enterprises Defendants FNRP, FNRA, and FNPM) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants' sale to Plaintiffs of shares in the LLCs. Mr. Palermo is also a control person pursuant to the various applicable securities laws. According to private placement memoranda prepared by Defendants, "Mr. Palermo oversees investor capital raising initiatives, strategic planning, portfolio management, and business development as well as formulating overall investment strategy." Upon information and belief, Mr. Palermo was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

38.     Defendant Jared Feldman is the Executive Chairman of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other individual Defendants named herein and the RICO Enterprises Defendants FNRP, FNRA and FNPM) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants' sale to Plaintiffs of shares in the LLCs. Mr. Feldman is also a control person pursuant to the various applicable securities laws. Mr. Feldman was the direct report of the Defendants' Chief Marketing Officer who was charged with responsibilities regarding preparation of marketing material that was distributed to Plaintiffs. Upon information and belief, Mr. Feldman was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

39.     Defendant Andrew DeNardo is the President – Head of Investor Relations – of Defendant FNRP. Mr. DeNardo is also Chief Executive Officer of FNPM. He is a RICO conspirator in this lawsuit (along with the other individual Defendants named herein and the RICO Enterprises Defendants FNRP, FNRA and FNPM) in connection with Defendants' conspiracy to defraud

Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in the LLCs. Mr. DeNardo is also a control person pursuant to the various applicable securities laws. According to offering memoranda prepared by Defendants, Mr. DeNardo "oversees FNRP's day to day operations…" Upon information and belief, Mr. DeNardo was the direct report of some, or all, of the salesman who solicited Plaintiffs' investments. Upon information and belief, Mr. DeNardo was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

40.    Defendant Kurt Padavano is the Chief Operating Officer of Defendant FNRP.  He is a RICO conspirator in this lawsuit (along with the other individual Defendants named herein, and the RICO Enterprises Defendants FNRP, FNRA and FNPM ) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in the LLCs. Mr. Padavano is also a control person pursuant to the various applicable securities laws. Upon information and belief, Mr. Padavano was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

41.    Defendant Bill Comeau is the Chief Financial Officer of Defendant FNRP.  He is a RICO conspirator in this lawsuit (along with the other individual Defendants named herein and the RICO Enterprises Defendants FNRP, FNRA and FNPM) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.  Mr. Comeau is also a control person pursuant to the various applicable securities laws. Upon information and belief, Mr. Comeau was

part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

42.     Defendant Fred Battisti is the Chief Revenue Officer of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other individual Defendants named herein and the RICO Enterprises Defendants FNRP, FNRA and FNPM ) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in the LLCs. Mr. Battisti is also a control person pursuant to the various applicable securities laws. Upon information and belief, Mr. Battisti was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

43.     Defendant Michael Hazinski is the Chief Investment Officer of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein and the RICO Enterprises Defendants FNRP, FNRA and FNPM ) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in the LLCs. Mr. Hazinski is also a control person pursuant to the various applicable securities laws. Upon information and belief, Mr. Hazinski was part of the executive team that conspired to silence concerns by John Chiappetta and Angela Hwang that Defendants' marketing material was misleading investors in violation of SEC rules and regulations.

## THE LLCs[13]

44.     BISHOPS CORNER SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Bishops Corner SC Realty Fund LLC is invested in commercial real estate located in West Hartford, Connecticut.

45.     BRANDYWINE CROSSING REALTY FUND LLC is a privately-held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Brandywine Crossing Realty Fund LLC is invested in commercial real estate located in Brandywine, Maryland.

46.     BROOK HIGHLAND SC REALTY FUND LLC is a privately-held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Brandywine Crossing Realty Fund LLC is invested in commercial real estate located in Alabama.

47.     CHAMPIONS VILLAGE REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Champions Village Realty Fund LLC is invested in commercial real estate located in Houston, Texas.

48.     CRISTINA CROSSING REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Champions Village Realty Fund LLC is invested in commercial

---

[13] The LLCs are identified for reference but are not named as parties to this suit.

real estate located in Delaware.  CRISTINA CROSSING TIC 8 MEMBER LLC and CRISTINA CROSSING TIC 11 MEMBER LLC are vehicles for investing in the same commercial real estate.

49.     CRS CENTER REALTY FUND LLC is a privately-held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. CRS Center Realty Fund LLC is invested in commercial real estate located in Georgia.

50.     CS CENTER REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. CS Center Realty Fund LLC is invested in commercial real estate located in University Heights, Ohio.

51.     DAUPHIN PLAZA REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Dauphin Plaza Realty Fund, LLC is invested in commercial real estate located in Pennsylvania. DAUPHIN PLAZA TIC 3 MEMBER, LLC is a vehicle for investing in the same commercial real estate.

52.     DAVENPORT MF REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Davenport MF Realty Fund, LLC is invested in real estate located in Florida.

53.     GRAYHAWK SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Grayhawk SC Realty Fund, LLC is invested in commercial real estate located in Nebraska. GRAYHAWK SC TIC 4 MEMBER, LLC is a vehicle for investing in the

same commercial real estate.

54.    HERITAGE PARK SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Heritage Park SC Realty Fund, LLC is invested in commercial real estate located in California.

55.    HH CENTER REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. HH Center Realty Fund, LLC is invested in commercial real estate located in Tennessee.

56.    INVERNESS CORNERS SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Grayhawk SC Realty Fund, LLC is invested in commercial real estate located in Alabama. INVERNESS CORNERS SC TIC 4 MEMBER, LLC and INVERNESS CORNERS SC TIC 10 MEMBER, LLC are vehicles for investing in the same commercial real estate.

57.    MANASSAS SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Grayhawk SC Realty Fund, LLC is invested in commercial real estate located in Virginia.

58.    MAPLE PARK SC REALTY MEMBER LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Maple Park SC Realty Fund LLC is invested in commercial real estate

located in Bolingbrook, Illinois. MAPLE PARK SC TIC 2 MEMBER LLC, MAPLE PARK SC TIC 9 MEMBER LLC, and MAPLE PARK SC TIC 11 MEMBER LLC are vehicles for investing in the same commercial real estate.

59.    MID-AMERICA GROCERY SC REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Mid-America Grocery SC Realty Fund, LLC is invested in commercial real estate located in Missouri and Indiana.

60.    MW CENTERS REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. MW Centers Realty FUND LLC is invested in commercial real estate located in Ohio.

61.    PC CENTER REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. PC Center Realty Fund LLC is invested in commercial real estate located in Canton, Michigan.

62.    SAND HILL PLAZA REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Sand Hill Plaza Realty Fund LLC is invested in commercial real estate located in Newtown, Connecticut. SAND HILL PLAZA SC TIC 4 MEMBER, LLC is a vehicle for investing in the same commercial real estate.

63.    SOUTHLAND CROSSINGS REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business

located in Red Bank, New Jersey. Southland Crossing Realty Fund, LLC is invested in commercial real estate located in Boardman, Ohio.

64.    SS TULSA CENTER REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. SS Tulsa Center Realty Fund, LLC is invested in commercial real estate located in Tulsa, Oklahoma.

65.    SUMMERDALE PLAZA REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Summerdale Plaza Realty Fund, LLC is invested in commercial real estate located in Pennsylvania.

66.    TANNEHILL REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Tannehill Realty Fund LLC is invested in commercial real estate located Bessemer, Alabama.

67.    TP CENTER REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. TP Center Realty Fund LLC is invested in commercial real estate located New York.

68.    TROPICANA CENTRE LV REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Tropicana Centre LV Realty Fund LLC is invested in commercial real estate located in Las Vegas, Nevada.

69.     VILLAGE AT PITT MILLS REALTY FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Village at Pitt Mills Realty Fund LLC is invested in commercial real estate located Pennsylvania.

70.     FIRST NATIONAL REALTY PARTNERS FUND IV LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. First National Realty Partners Fund IV LLC invested in the Carriage Place Shopping Center located in Ohio and the Haymarket Village Center located in Virginia.

71.     NORTHEAST PLAISTOW FUND LLC is a privately held limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. Northeast Plaistow Fund LLC invested in commercial real estate located in New Hampshire.

**FACTS**

72.     Defendant FNRP is a private equity firm (allegedly with over $2 Billion in reported assets), that raises capital from investors to purchase commercial real-estate properties for investment. Plaintiffs are private investors that purchased from Defendants shares in various Limited Liability Companies (the "LLCs"), which Defendants conspired to fraudulently market and sell to Plaintiffs (and which are the basis for this lawsuit) (the "LLCs").[14]  Throughout 2022 and 2023, and prior, Defendants offered to Plaintiffs and other investors shares in the LLCs.

---

[14] See supra listing the LLCs.

73.     From the start, Defendants conspired to engage in a systematic pattern of deception and fraud with respect to Plaintiffs' investments in the LLCs, which permeated every aspect of Defendants' interactions and business dealings with Plaintiffs (as well as the financials for the Underlying Properties and the LLCs), and which allowed Defendants to wrongfully collect more than $7 Million from Plaintiffs.

74.     Defendants initially employed sophisticated, abusive phone-tactics, and ran a masterful – but fraudulent – sales-and-telemarketing operation, that preyed upon investors seeking investment returns, like Plaintiffs.  Defendants personally and through various employees/sales agents made (and continue to make) thousands of intrastate and interstate telephonic sales calls per month, and contacted potential investors throughout the country.[15]

75.     Defendants falsely represented in offering memoranda that "The members of FNRP's investment committee search for high quality investments that can be acquired at perceived discounts to both market value and replacement cost." [16]

76.     Defendants falsely represented in offering memoranda:

> The success of the investment strategy lays in FNRP's intentional focus on sourcing large amounts of off market deal flow and very selectively choosing which assets to acquire.
>
> FNRP separates itself by attempting to "make money on the buy" on each investment. In other words, FNRP will only seek to purchase assets that it feels can be purchased below market. This built-in value resides in the Contract.

---

[15] Defendants' conspiracy to use unscrupulous and manipulative sales and marketing techniques convinced each Plaintiff (and other investors) to invest in the LLCs, by providing Plaintiffs with fraudulent and deceptive information, and collecting the investment funds from Plaintiffs via the U.S. Mail and/or intrastate and interstate wire transfers.

[16] Defendants removed access to the deal rooms containing the offering memoranda for each of the investments, so Plaintiffs are no in possession of the memoranda for each fund.  However, based upon the memoranda that have been reviewed, it appears each Offering Memorandum contained similar or identical language.

77.     Defendants falsely represented in offering memoranda:

> The investment objective of the Fund is to generate attractive risk-adjusted rates of return primarily through the acquisition of income-producing real estate at a discount to market value, with prospects for repositioning to create additional capital appreciation. Initial capital appreciation may be captured through the discount to market value attributable to the Contract.

78.     In addenda to the offering memoranda, Defendants falsely state, in language that appears to be copy and pasted into each memoranda, that "a motivated seller is allowing us to purchase these centers at a favorable cap rate on in-place NOI with NOI having the potential to increase once the lease up of the centers is complete."

79.     Defendants then, upon information and belief, conspired to falsely overvalue the Underlying Properties so that Defendants could unlawfully and fraudulently abscond with the difference in price between the amount that Plaintiffs invested in each Underlying Property and the lesser price Defendants actually paid for each Underlying Property. Upon information and belief, one egregious example where Defendants used their scheme and conspired to substantially overvalue the Underlying Property, and wrongfully collect from that property significant funds, was an investment that Defendants sold to investors, named: _Waldorf Plaza_.[17] A former insider has asserted that Waldorf Plaza was acquired by FNRP and its affiliates and then marked up millions of dollars before being sold to investors. Internal financial records filed into the public record in a case between FNPM and a former employee reflect that FNRP extracted $10,223,277 in "Closing Costs and Fees" from the Waldorf Plaza property between its acquisition and re-sale to investors. The insider has further asserted that similar practices were widespread within investments marketed by

---

[17] Plaintiffs will seek in discovery information and financials respecting the _Waldorf Plaza_ deal that Defendants' conspired to severely overvalue.  Plaintiffs are not invested in Waldorf Plaza but it is believed that Defendants pursued similar practices with other properties as well.

FNRP.

80.     Upon information and belief, a similar discrepancy exists with respect to the Tropicana Center property. An investor has discovered that the final purchase price of the property was $71.929 million, but that Defendants escrowed $82.424 million to fund the purchase, creating a discrepancy of approximately $10.5 million.  That investor has submitted inquiries to FNRP about the discrepancy but to Plaintiffs' knowledge FNRP has failed to respond.

81.     The circumstance suggest that similar fraudulent overvaluations apply in connection with other properties. Certain properties have been placed into cash sweeps by lenders despite being nearly fully leased.  For example, in the Q1 2025 investor report for Haymarket Center, Defendants report that the property is 100% leased, but has been in a cash sweep with the lender since the fourth quarter of 2022, and therefore cannot make distributions, because of a credit downgrade of a well-known national tenant.  Cash flows from the fully leased property are barely sufficient to cover cash flow needed for operating expenses, even with the asset management fees being accrued rather than paid.  Neither substantial capital improvement expenses or rising interest rates could explain this, because the property is still on a 5.13% fixed-rate mortgage.  The only conceivable explanation is that Defendants grossly overpaid for the property (or purchased at a market price and then marked it up before selling to investors), and then extracted fees based upon that inflated purchase price, thereby making it impossible to turn a meaningful profit.

82.     Similarly, in regard to the Shore Center property, which is part of the MW Centers Realty Fund, LLC, Defendants announced in their report for the first quarter of 2025 that distributions would be stopped because of a $360,000 tenant improvement expense and the anticipation that a tenant would leave after the third quarter of 2025, despite the fact that the property is reported as

being 96.50% leased with loans at a low fixed interest rate. This suggests that it was simply untrue when Defendants represented that the properties were acquired at below market prices and favorable cap rates.

83.    The Premier Center property, which was purchased by PC Center Realty Fund in November 2021 is allegedly in negotiations to be sold to a third-party, at a substantial loss to investors, despite the fact that the property is allegedly 99.96% leased. Defendants have estimated that "estimated return to the investors is anticipated to range between 0.85x - 0.95x equity multiple." In other words, at a substantial loss four years after the purchase, despite allegedly having been acquired at below market value.

84.    Defendants conspired to defraud Plaintiffs by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false – and then fraudulently skimming from Plaintiffs **more than half** of the returns from the investment-properties they buy. See Dr. McCann Article at 3 (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann ) (showing an example Defendants scheme and Cash Distributions Chart concerning Defendants' purchase of and financial accounting for Defendant LLC –*Maple Park SC Realty Fund LLC* ("Maple Park") – and concluding that "**FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself**.") (emphasis added).

85.    Moreover, Defendants violated Securities and Exchange Commission Regulation D by marketing and selling shares in the LLCs to Plaintiffs and other investors (i.e., private placement securities), while paying illegal transaction-based compensation to their salespersons without a broker-dealer license, and also by Defendants paying their salespersons transaction-based

compensation under the guise of a bonus pool.

86.     In presenting the investments in the LLCs to Plaintiffs, Defendants falsely held out that Defendants had completed all of their required due diligence before purchasing each of the underlying investment properties (and that of Underlying Properties required virtually no material improvements before they could be occupied for profit and re-sold by Defendants in the near future).

87.     In actuality, Defendants conspired to form a construction arm of their business (under the guise of being separate from Defendants) where Defendants conspired to significantly deplete the assets of the LLCs and Plaintiffs' investments and distributions – by feigning material improvements and, upon information and belief, collecting millions of dollars for construction-work to the Underlying Properties.[18]

88.     In fact, Defendant FNRP falsely stated in a video on their company website that, before every purchase of an investment property by Defendants: *"we have a Strike Force . . .[and] we turn over every stone we can prior to closing on an asset to make sure there are no surprises once we close."*[19]

89.     Defendants further falsely stated in offering memoranda that "FNRP puts each potential asset through a rigorous financial modeling and due diligence review by FNRP's in-house team. The success of the investment strategy lays in FNRP's intentional focus on sourcing large amounts of off market deal flow and very selectively choosing which assets to acquire."

90.     Defendants further falsely stated in offering memoranda that:

---

[18] See also *Dr. McCann Article* (attached hereto as Exhibit 1, with the Curriculum Vitae of Dr. McCann)

[19] *https://fnrpusa.com/fnrp360/* (emphasis added).

FNRP employs a rigorous screening process that involves continuous monitoring of real estate fundamentals. Deal-specific screening includes a preliminary assessment of key metrics and the extent to which a thorough due diligence process can be completed due to time and other transaction constraints. Throughout the screening and diligence process, FNRP will reevaluate the risks of the transaction on an ongoing basis; refine its analysis of whether a competitive advantage to both successfully invest and implement its business plan exists; and whether the complexity of execution of the strategy is fully understood.

91.     The foregoing representations were false. For instance, approximately two to three years ago, Defendants purchased *Summerdale Plaza Realty Fund LLC* ("*Summerdale Plaza*") for approximately $18 Million, and Defendants sold shares in that Underlying Property to investors.  In marketing *Summerdale Plaza,* Defendants touted to investors that the *Summerdale Plaza* investment was a stabilized, extremely-conservative investment that was virtually guaranteed to be resold for profit. On February 6, 2025, however, investors were informed by Defendants that Defendants sold *Summerdale Plaza* for approximately $15 Million –**a 60% loss** to investors in their Summerdale Plaza investment, which, upon information and belief, stems from Defendants' skimming from the Summerdale investment.[20]

92.     When the property was acquired in December 2021, Defendants' offering memoranda for Summerdale Plaza Realty Fund LLC had represented to investors that there would be projected annual cash flow to investors "in the blended 7.5-8.2% range annually" and that the "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 12.5 to 13.1% to the Non-Managing Members. However, the property never made any distributions to investors prior to its sale.

---

[20] See Dr. McCann Article at 3 (attached hereto as Exhibit 1, with the Curriculum Vitae of Dr. McCann ). Plaintiffs will seek discovery in this case to determine how Defendants could possibly allow such a massive loss to occur on a purportedly stabilized, extremely-conservative investment.

93.     Similarly, in October 2022, Defendants acquired the Tropicana Centre in Las Vegas, Nevada, purportedly using the same "strike force" to ensure there were no surprises after closing. Instead, the property immediately ran into costly issues with needed capital expenditures that lead to the suspension of distributions.  FNRP alleged to have identified a backflow project in its due diligence process and that it anticipated would cost $400,000. However, by July 2023 it had announced to investors that it would actually cost $1,000,000.  By early 2023, when it issued its quarterly report for the fourth quarter of 2023, FNRP admitted that the cost had increased to $1.25M. In the next quarterly report, the cost increased yet again to $1,766,067.  The backflow project is still yet to be completed and distributions remain suspended. Despite the suspension of distributions, in 2024 alone, Defendants and their affiliates collected $276,960 in property management fees, charged $238,791 in general administrative expenses, and accrued asset management fees.

94.     Defendants further announced that, as a result of the backflow project, "to ensure financial stability through the completion of the backflow project, distributions and asset management fees will be withheld."[21]  Despite admitting that Defendants were aware of the need for the project at the time of acquisition, Defendants failed to disclose to investors that it would require withholding of distributions.  Moreover, despite projections that the project would be completed by May 2024, distributions were still being withheld through the third quarter of 2024 and Defendants announced in their third quarter report that they would continue to be withheld until the project was completed. In fact, distributions still have not been recommenced.

95.     Similarly, the Bishops Corner project experienced numerous expensive repair issues that required large capital commitments and resulted in the cessation of distributions.  Those included

---

[21] Notably, although such fees are not being paid, they are still being accrued, thereby further diminishing the investor's investments in the LLCs.

$1,030,000 in expenditures on sewer ejector pump and exhaust systems, $500,000 in exterior repairs, the loss of a tenant due to being shut down by the health department due to leaks in the ventilation system, a lift station failure resulting in flooding that required extensive repairs, and numerous failing lights in the parking lot.

96.     Similarly, in a July 28, 2023 letter to investors of the Mid-America Grocery SC Realty Fund, LLC, Defendants announced that the River City Marketplace, a property purchased by that fund less than a year prior on October 13, 2022, would stop distributions because of an anticipated roof replacement due to leaks in the anchor unit. In its quarterly report for the first quarter of 2025, Defendants further announced that their lender was requiring replacement of the parking lot based upon a recent inspection. That the alleged "strike force" was unable to identify that the parking lot and the roof of the anchor unit needed replacement is inconceivable if it had done any meaningful due diligence.  The only plausible conclusion is that they did not or, that they did, were aware of the problems, failed to disclose them, and went through with the transaction anyway because they knew they could sell it to unsuspecting investors and generate massive fees.

97.     As such, Defendants either (a) fraudulently held out to Plaintiffs – at the time of Plaintiffs' investments – that Defendants had completed all of their due diligence respecting their purchase of the Underlying Properties (and that the Underlying Properties were in good, working order) or (b) fraudulently held out to Plaintiffs – after Plaintiffs' made their investments in the Defendant LLCs – that Defendants' construction company was required to charge the Underlying Properties and Plaintiffs millions of dollars to work on multiple, material improvements for the Underlying Properties.[22]

---

[22]  See https://fnrpusa.com/fnrp360/ (video and website where Defendants claim they perform all of the due diligence required by them using their "Strike Force Team," before purchasing investment properties).  The Defendants have since removed the video.

98.     Plaintiffs were further lied to by Defendants and told that Plaintiffs would have access, any time they requested, to the documents and financials respecting the Underlying Properties, including the list of other investors. But when investors requested these items, in order to cover-up Defendants' fraud, conspiracy, and material misrepresentations, Defendants made it their policy of refusing to provide investors any underlying documents (or the list of other investors), despite repeated demands by investors.

99.     In turn, Defendants' intentionally failed to provide investors with final copies of the Purchase Documents with reasonable time before Defendants required investors to execute the Purchase Documents (so investors' attorneys could not properly review the Purchase Documents and investors were unaware of many contract terms and financial-numbers that Defendants added at the last minute. Defendants also calculatingly stalled their completion of the Purchase Documents until just before investors were required to file their 1031 property-exchange documents (which investors had already designated with the IRS, so investors were afraid to push back the date that Defendants required investors to execute the Purchase Documents).

100.    Defendants concealed their conspiracy and wrongful conduct from Plaintiffs, and kept Plaintiffs from being able to physically keep, review, or compare the literature, documents, and financials that Defendants used to present to Plaintiffs the terms concerning Plaintiffs' LLC investments and Defendants' purchases of the Underlying Properties, by activating a computer program called "The Deal Room" – which serves to delete Defendants' literature, documents and financials related to the LLCs after a short period of time.  This enabled Defendants to make

fraudulent presentations to Plaintiffs regarding the LLC investments, and then covertly "take back" all of the documents they produced in those presentations.[23]

101.    Moreover, to give Defendants unfettered ability to continue their scheme, Defendants unilaterally designated themselves as the asset manager for the LLCs (the "Asset Manager"), and also as the sole realtor respecting commercial-tenant deals in the Underlying Properties (the "Sole Realtor").  Then, Defendants conspired to fraudulently and secretly include provisions in the Purchase Documents that blocked Plaintiffs' right to remove Defendants from those posts. Thus, Defendants were able to continue their wrongful conspiracy and further defraud Plaintiffs and deplete the assets of the LLCs.[24]

102.    With Defendants now holding this self-imposed, "Golden Ticket" as the Asset Manager, the Sole Realtor, and Manager of the LLCs (a textbook conflict-of-interest), Defendants conspired to fraudulently manage the Underlying Properties, which enabled Defendants to wrongfully collect from Plaintiffs and the LLCs: (i) millions of dollars in fraudulent fees and other charges – disguised as payments for services to various Defendant-owned companies; and (ii) unreasonable, self-serving commissions and tenant-leasing fees and costs.[25]

---

[23] Plaintiffs will serve discovery requests and third-party subpoenas in this case for all documents that Defendants' kept or used at any time in The Deal Room.

[24] Pursuant to the provisions of the Purchase Documents, removal of Defendant FNRA as the Asset Manager requires unanimous consent of every Defendant LLC. To block Plaintiffs and the other investors from being able to accomplish this removal process, Defendants paid $1 to make themselves a voting LLC.  With Defendants as a voting LLC, unanimous consent to remove Defendant FNRA as the Asset Manager of the Defendant LLCs became impossible for Plaintiffs.

[25] Plaintiffs believe that discovery will show considerable other ways that Defendants wrongly collected fees from the Defendant LLCs and conspired to defraud Plaintiffs, including Defendants setting up and using other related entities to wrongfully collect fees from the Underlying Properties and the Defendant LLCs.

103.    Defendants charged these unreasonable fees despite false representations in their offering memoranda that their fees were "competitive with typical private investment partnerships," were "comparable to market rate prices that a 3rd party would charge if these services were outsourced." and that they would "exercise good faith and fairness in all dealings affecting the Fund."  In fact, Defendants fees were not competitive with typical private investment partnerships or market rates and they had no intention of honoring the commitment to act fairly and in good faith when it was made and their entire business plan revolved around charging exploitative fees.

104.    As the Sole Realtor, Defendants also conspired to wrongfully collect unreasonable, self-serving commissions and leasing fees regarding tenant-leasing deals. One egregious example of Defendants entering into a self-serving lease deal is the 2024 lease agreement between Defendant Maple Park Place LLC and tenant Five Below, which Defendants executed and from which Defendants earned substantial commissions and fees. The reported leasing costs were $1,071,380 for a lease agreement *valued only at $2,286,284 over 10 years* – which makes absolutely no business or logical sense.  And on top of that, Defendants took six-months longer than reasonable to complete the self-serving, Five Below deal.

105.    In order to induce Plaintiffs investments, Defendants made representations to Plaintiffs in the private placement memoranda and *Asset Management Agreements* that they would provide Plaintiffs with information and participation in decisions on key decisions. Specifically, Defendants misrepresented that they would (1) send regular Reports, Budgets or Notifications for the Defendant LLCs and/or the Underlying Properties to Plaintiffs for review and/or approval; (2) notify or gain approval from Plaintiffs for Defendants' material expenditures on the Underlying Properties outside those contemplated in the LLC operating agreements.  Defendants made the commitments to induce Plaintiffs to invest in the projects. However, Defendants made such commitments with the intent to

breach them because breaching such commitments was a necessary component of the premeditated scheme to extract excessive fees and payments from the LLCs and Underlying Properties and engage in self-dealing with their affiliated entities. Defendant knew that if Plaintiffs were provided the requested information, they would attempt to take action to prevent Defendants from extracting such fees and other payments.  Defendants further facilitated such concealment by refusing to provide to investors documents (or the list of other investors) related to the Underlying Properties, as required by the AMA.[26]  Defendants likewise failed to provide GAAP-financials, as promised in the private placement memoranda, which would have exposed the extent to which Defendants were exploiting the properties through self-dealing and excessive fees.

106.    Specifically, Defendants failed to:

- deliver to the tenants-in-common Annual Budgets and Operating Plans for the LLCs, which Defendants were required to deliver by the 15th of December each year;

- notify the tenants-in-common of any expenditures Defendants made respecting the Underlying Properties that were not within the budget;

- notify the tenants-in-common of material increases in costs and expenditures respecting the Underlying Properties.

- notify the tenants-in-common of leasing expenditures and vacancies outside the Operating Plan respecting the Underlying Properties;

- notify the tenants-in-common of capital expenditures outside the Operating Plan respecting the Underlying Properties;

- bid out contracts and expenditures over a certain threshold amount respecting the Underlying Properties;

---

[26] Plaintiffs do not bring any claims for breach of the AMA.  Rather, this evidence is simply cited as evidence of the misrepresentations and omissions made by Defendants to induce the sale of securities to Plaintiffs.

- deliver accounting documents for the LLCs for tax filing purposes within the scheduled deadline.

107.    To induce Plaintiffs' investments, FNRP represented in its marketing material and on its website that it had a track record of achieving average annual investor returns of 12 to 18+%. Although FNRP provides no support for this assertion, it is almost certainly false.  Vanguard's REIT index fund which tracks US traded REITs has had an 8.1% annualized return over the past 25 years and those REITs generally do not charge fees anywhere near as high as Defendants. As explained by Dr. McCann in the attached report, "FNRP takes more than half of investors' returns in equity distributions, "carried interest" and asset management fees while charging separately for the services provided for by the traded REITs…. FNRP's business model could not deliver investor returns of more than 3% or 4% per year on average when properly accounted."[27]

108.    Despite the fact that such promised returns were impossible given the levels of fees charged, Defendants provided such fraudulent projections in connection with each of the LLC investments.  For example, on the Tannehill Promenade investment, Defendants represented in their marketing material that there would be projected distributable cash annually from 2022 through 2024 ranging from $1,105,389 at the low end to $1,783,741 on the high end, with a complete return of capital by year 3 and an annualized rate of return of 15.3%.

109.    In reality, Tannehill Promenade never came close to meeting those financial projections. In its first year of operation, distributions were less than $450,000, approximately half of what was projected, and in 2023 they did not even reach $200,000 before they stopped altogether.

110.    Similarly, on the Southland Crossings Realty Fund investment, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to

---

[27] See Dr. McCann Article at 2-3.

investors of 7.75 to 8.4% and "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 12.1 to 12.7% to the Non-Managing Members."

111.     In reality, Southland Crossings never came close to meeting those financial projections. The property was acquired on November 16, 2021, but was in cash flow sweeps with its lender by the first quarter of 2023 and ceased all distributions to investors by the second quarter of 2023. Despite paying no cash to investors during 2024, Defendants collected $146,472 in property management fees and $88,429 in asset management fees in 2024, among other amounts extracted from the property.

112.     Similarly, on the Bishops Corner investment, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to investors of 6 to 6.5% and projected "annual internal rate of return on capital invested which includes cash distributions and capital appreciation is targeted to be in excess of 12% to the Non-Managing Members."  In reality, Bishops Corner, which was acquired on November 30, 2022, went into cash sweep with its lender in the first quarter of 2025 and ceased distributions. Distributions before that date were substantially below projections.

113.     Similarly, on the Tropicana Center investment, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to investors of 6 to 6.5% and "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 13.5 to 14% to the Non-Managing Members." In reality, Tropicana Center, which was acquired on October 31, 2022, announced in its report to investors for the second quarter of 2023, which was distributed at some

point in the third quarter of 2023, that it would be suspending distributions, but that Defendants' "outlook remains optimistic." However, distributions never re-started.

114.    Similarly, on the Brook Highland Plaza investment, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to investors of 6.5 to 7.1% and "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 12.5 to 13.3% to the Non-Managing Members." In reality, Brook Highland Plaza, which was acquired on July 7, 2022, announced in its report to investors for the first quarter of 2024 that it would be suspending distributions. Distributions never re-started.

115.    Similarly, on the Mid-America Grocery SC Realty Fund, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to investors of 6.25 to 6.75% and "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 12.5 to 13.2% to the Non-Managing Members." In reality, the Fund, which included two properties acquired in 2022, announced in its report for the third quarter of 2022, announced in a letter to investors dated July 28, 2023 that it would be suspending distributions.  The distributions never re-started.

116.    Similarly, on the Brandywine Crossing investment, the offering materials provided to Plaintiffs by Defendants represented that there would be average annual cash flow to investors of 7.25 to 7.8% and "projected annual internal rate of return on capital invested which includes cash distributions and capital appreciation is projected to be in a range of 14.5 to 15.1% to the Non-Managing Members."

117.    In reality, Brandywine Crossing, which was acquired on March 29, 2022, went into cash sweep with its lender in the third quarter of 2022, just months after the investment was made, and

ceased all distributions. In 2025, Defendants announced that they had attempted to market the property for sale and only received one offer for $58.5 million, substantially less than the alleged $64 million purchase price, despite Defendants (false) representations that the property had been acquired for below market value. It is inconceivable that Defendants' projections regarding the Brandywine property, and representations regarding thorough due diligence, could have been made in good faith yet turned out to be so shockingly inaccurate just months after the investment. In reality, the circumstances reflect that Defendants were not doing thorough due diligence, buying properties at below market value, or making good faith financial projections. Instead, they were simply acquiring any properties they could get their hands on as fast as they could sell membership interests to investors such as Plaintiffs so that Defendants could extract any value that existed in the properties for themselves through fees, self-dealing, and carried interests.

118.    Upon information and belief, Defendants provided similarly exaggerated and false financial projection regarding each of the LLCs that they marketed to Plaintiffs.[28]

119.    As set forth in the below chart, nearly all of the properties sold to Plaintiffs have ceased distributions:

| Properties | Status of Distributions as of Q1 2025 |
|---|---|
| Bishops Corner SC Realty Fund LLC | Suspended |
| Brandywine Crossing Realty Fund LLC | Suspended |
| Brook Highland SC Realty Fund | Suspended |
| Carriage Place Shopping Center | Suspended |
| Champions Village Realty Fund LLC | Previously suspended for two years |
| Cristina Crossing Realty Fund LLC | Distribution to be made |
| CRS Center Realty Fund LLC | Suspended |
| CS Center Realty Fund LLC | Suspended |
| Dauphin Plaza Realty Fund LLC | Suspended Q4 2024, Restarted Q1 2025 |
| Davenport MF Realty Fund LLC | Suspended |
| Grayhawk SC Realty Fund LLC | Previously suspended |

---

[28] Because Defendants restricted access to the Deal Rooms, Plaintiffs no longer have access to all of the original financial projections.

| | |
|---|---|
| Haymarket Village Center | Suspended |
| Heritage Park SC Realty Fund | Suspended |
| HH Center Realty Fund LLC | Suspended |
| Inverness Corners SC Realty Fund LLC | Distribution to be made |
| Manassas SC Realty Fund LLC | Distribution to be made |
| Maple Park SC Realty Fund LLC | Suspended |
| Mark Twain Village (thru fund) | Distribution to be made |
| Mid-America Grocery SC Realty Fund LLC | Suspended |
| MW Centers Realty Fund LLC | Suspended from one property. Additional suspension anticipated by management |
| Northeast Plaistow Realty Fund LLC | Distribution to be made |
| PC Center Realty Fund LLC | Suspended |
| Sand Hill Plaza SC Realty Fund LLC | Suspended |
| Southland Crossings Realty Fund LLC | Suspended |
| SS Tulsa Center Realty Fund LLC | Suspended |
| Summerdale Plaza Realty Fund LLC | Property sold at loss |
| Tannehill Realty Fund LLC | Suspended |
| TP Center Realty Fund LLC | Distribution to be made |
| Tropicana Centre LV Realty Fund LLC | Suspended |
| Village at Pitt Mills Realty Fund LLC | Previously suspended |

120.    Even certain properties that are making distributions are doing so out of cash reserves rather than cash flow.  For example, Cristina Crossing is making distributions, but is making them in amounts in excess of the net cash flow of the property, thereby depleting cash. The 2025 budget for Cristina Crossings anticipates that distributions to investors will exceed cash flow by $505,000, which implies that distributions will either be greatly reduced or stopped altogether in the near future.

121.    Likewise, the Manassas SC Realty Fund LLC is also making distributions from cash reserves, rather than cash flow, and is projected to continue doing so for at least the next two quarters according to Defendants' own budget for 2025 which, if consistent with past projections, is likely overly optimistic to say the least.

122.    Likewise, although it made distributions from cash flow in the first quarter of 2025, Defendants own 2025 budget reflects that Inverness Corners will be unable to continue to do so later this year once the mortgage on the property is no longer interest-only.

123.    Similarly, Grayhawk SC Realty Fund budgeted to have all distributions suspended for 2025. Despite cash flow for the first quarter actually being *less* than projected, Grayhawk made a distribution far in excess of cash flow, likely to attempt to stave off additional litigation.

124.    Even those properties making distributions from cash flow are doing so at extremely low levels. For example, Northeast Plaistow is currently satisfying distributions out of cash flow, but only at a cash-on-cash rate of 3.17%, below what money-market funds are currently paying.

125.    Notably, Defendants provide alleged reasons for the suspensions in connection with each of the above properties and they are almost all property-specific excuses that do not relate to broader market conditions. In fact, the true reasons for the suspensions are that (1) Defendants overpaid for the properties instead of purchasing them at below-market values as represented, (2) Defendants failed to conduct thorough due diligence on the properties thereby leading to expensive necessary repairs and improvements that consumed cash flow, and (3) Defendants financial projections were completely disconnected from reality and the excessive fees that they charged made the projections impossible to achieve.

126.    The offering materials for most funds also projected a three-year hold period prior to being able to sell the property for substantial gains. However, to date, almost none of the properties have sold and those that have, have sold for a loss. Defendants have financial incentives to continue holding the properties in order to continue collecting fees. Moreover, selling the properties would expose the extent to which Defendants overpaid for the properties.

127.    According to a Complaint filed against FNPM by Angela Hwang, former Chief Marketing Officer of FNPM, throughout her employment, she repeatedly raised concerns about what she believed were unethical practices by FNPM and its affiliates, including "whether the website content and marketing materials were compliance with SEC rules prohibiting 506(c) companies from promising or exaggerating returns." According to Ms. Hwang, marketing material did not appear to be regularly reviewed for SEC compliance. Ms. Hwang alleges that she repeatedly asked the company to remove phrases in its marketing material that promised returns. According to Ms. Hwang, she raised these concerns repeatedly to Defendant DeNardo.

128.    According to Ms. Hwang's Complaint, she then reached out to Defendants' SEC compliance expert, John Chiappetta, to express her concerns about the false promises to investors. Mr. Chiapetta informed her that "these guys just didn't listen" to him.

129.    Thereafter, Ms. Hwang alleges that she set up a process to ensure that Mr. Chiapetta reviewed marketing materials to ensure that they complied with SEC requirements, but executive leadership ignored Mr. Chiappetta's questions and concerns. According to Ms. Hwang, Defendant Feldman informed her that he would override Mr. Chiappetta and make the final call when the executive team did not like what Mr. Chiappetta was telling them. This evidence reflects that Defendants had actual knowledge that their projections were false and misleading and continued to provide them to prospective investors anyway in an attempt to defraud such investors.

130.    To induce Plaintiffs' investments, Defendants provided Plaintiffs with knowingly false financial projections that Defendants had to know at the time were unreasonable and unachievable based upon the level of fees they were intending to charge. Plaintiffs then relied upon these projections in making their investments in the LLCs. General market conditions cannot be blamed for the dramatic failures to meet expectations, because benchmark indices in the real estate sector

have yielded positive returns over the same time period. Rather, Defendants' representations were not just incorrect, but fraudulent, unachievable, and without any basis in reality when made.

131.    According to Ms. Hwang, Defendants also made arbitrary changes to their reported amount of assets under management reflected on their website and marketing material. According to Ms. Hwang, the reported amount of assets under management literally changed overnight from $1.6 billion to $2 billion. Upon information and belief, this change was give the firm more credibility with investors. According to Ms. Hwang, when executives were asked about the change, they told her they just redid the numbers.

132.    According to Ms. Hwang, she raised concerns to the Defendants' executive management team that they were misleading existing investors by holding "Q&A" sessions, but instead of answering actual investor questions, making up their own fake investor questions and answering those instead.

133.    According to Ms. Hwang, between May and July 2023, her concerns regarding marketing materials' compliance with SEC rules escalated and, in an early July call, Mr. Chiappetta asked management how the company was coming up with its numbers in marketing material and raised additional concerns that the way they were defining some terms did not make sense and that there were not enough footnotes explaining what the terms actually meant.

134.    On or about August 1, 2023, Ms. Hwang was informed that Mr. Chiappetta resigned from his position. However, the circumstances suggest that he was actually fired for repeatedly expressing his concerns regarding the unethical marketing practices by Defendants. The same day, FNPM terminated Ms. Hwang, but subsequently told people that she had resigned as well.

135.    Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiffs. Plaintiffs were not aware of, nor, through the exercise of due diligence, could have

become aware of Defendants' wrongful actions until such wrongful actions brought to light by third-parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiffs the above materially false and omitted information. Defendants' failure to do so constitutes fraudulent concealment under law.

136.    Plaintiffs have repeatedly requested that Defendants cancel and return Plaintiffs' investments in the LLCs, but Defendants have refused Plaintiffs' requests.

137.    By paying their salespersons transaction-based compensation, Defendants' salespeople were required to register as securities salesman with the Financial Industry Regulatory Authority ("FINRA") and state securities regulators and, as a result, are responsible for complying with all FINRA rules and regulations, including suitability obligations and Regulatory Best Interest, including the disclosure obligations required thereby.

138.    Due to Defendants ongoing misrepresentations and concealment, including their failure to provide GAAP financial statements, Plaintiffs did not learn of the scope of the misrepresentations until within two years of filing this suit.  Plaintiffs also did not learn that Defendants securities salesmen were being paid transaction-based compensation, thereby removing them from potential registration exemptions, until within two years of filing suit.

### Plaintiffs' Investments in the LLCs

139.    Plaintiffs made the following investments in the LLCs:

| Last Name | First Name | Properties | Contribution |
|---|---|---|---|
| Mcgrath | Michael | Tropicana Centre LV Realty Fund LLC | $100,000.00 |
| Shah | Saumya | Bishops Corner SC Realty Fund LLC | $50,000.00 |

| | | Maple Park SC Realty Fund LLC | $150,000.00 |
|---|---|---|---|
| Dashefsky | Ricky | Northeast Grocery-Anchored Portfolio | $50,853.00 |
| | | MW Centers Realty Fund LLC | $50,000.00 |
| | | Maple Park SC TIC 9 Member LLC | $48,006.72 |
| | | Inverness Corners SC TIC 10 Member LLC | $17,724.68 |
| | | CS Center Realty Fund LLC | $50,000.00 |
| | | CRS Center Realty Fund LLC | $50,000.00 |
| | | Carriage Place Shopping Center (thru fund) | $50,000.00 |
| | | Haymarket Village Center (thru fund) | $100,000.00 |
| | | Southland Crossings Realty Fund LLC | $50,000.00 |
| | | Tropicana Centre LV Realty Fund LLC | $50,000.00 |
| Larsen | Timothy | Mid-America Grocery SC Realty Fund LLC | $85,000.00 |
| Bear Foley LLC | | Bishops Corner SC Realty Fund LLC | $100,000.00 |
| Rossi | Bill | Brook Highland SC Realty Fund | $50,000.00 |
| Warness | Gary | PC Center Realty Fund LLC | $100,000.00 |
| | | Tannehill Realty Fund LLC | $50,000.00 |
| | | SS Tulsa Center Realty Fund LLC | $50,000.00 |
| | | Brandywine Crossing Realty Fund LLC | $50,000.00 |
| Lapietra | Jeff | Inverness Corners SC Realty Fund LLC | $50,000.00 |
| | | Grayhawk SC Realty Fund LLC | $100,000.00 |
| | | Champions Village Realty Fund LLC | $50,000.00 |
| | | Davenport MF Realty Fund LLC | $100,000.00 |
| | | Brook Highland SC Realty Fund LLC | $125,000.00 |
| Snyder | Rod | Brandywine Crossing Realty Fund LLC | $25,000.00 |
| | | Southland Crossings Realty Fund LLC | $25,000.00 |
| Salifu | Idoko | Dauphin Plaza Realty Fund LLC | $300,000.00 |
| | | Champions Village Realty Fund LLC | $350,000.00 |
| | | Tropicana Centre LV Realty Fund LLC | $100,000.00 |
| DiN Properties, LLC | | Mid-America Grocery SC Realty Fund LLC | $125,000.00 |
| | | Brook Highland SC Realty Fund LLC | $250,000.00 |
| Johnson | Jeffrey | MAPLE PARK SC TIC 2 MEMBER LLC | $500,000.00 |
| | | Mid-America Grocery SC Realty Fund LLC | $50,000.00 |
| | | Manassas SC Realty Fund LLC | $50,000.00 |
| | | Inverness Corners SC Realty Fund LLC | $50,000.00 |
| | | Sand Hill Plaza SC Realty Fund LLC | $50,000.00 |

| | | | |
|---|---|---|---|
| | | Bishops Corner SC Realty Fund LLC | $50,000.00 |
| | | Tropicana Centre LV Realty Fund LLC | $50,000.00 |
| GISIM Properties LLC | | Brook Highland SC Realty Fund LLC | $50,000.00 |
| | | Champions Village Realty Fund LLC | $50,000.00 |
| | | Heritage Park SC Realty Fund | $50,000.00 |
| | | HH Center Realty Fund LLC | $50,000.00 |
| | | TP Center Realty Fund LLC | $50,000.00 |
| | | Village at Pitt Mills Realty Fund LLC | $50,000.00 |
| Groshong | Joel | Grayhawk SC TIC 4 Member LLC | $750,000.00 |
| | | Sand Hill Plaza SC TIC 4 Member LLC | $1,000,000.00 |
| | | Cristina Crossing SC TIC 8 Member LLC | $600,000.00 |
| | | Cristina Crossing SC TIC 11 Member LLC | $400,000.00 |
| | | Maple Park SC TIC 11 Member LLC | $405,000.00 |
| | | Inverness Corners SC TIC 4 Member LLC | $750,000.00 |
| Windish | Barrett | Mark Twain Village (thru fund) | $190,000.00 |
| | | Northeast Plaistow Realty Fund LLC | $50,000.00 |
| Herrera & Saenz Properties, LLC | | Summerdale Plaza Realty Fund LLC | $500,000.00 |
| | | Brandywine Crossing Realty Fund LLC | $200,000.00 |
| | | Dauphin Plaza TIC 3 Member LLC | $584,157.72 |
| | | **TOTAL:** | **$9,430,742.12** |

## CAUSES OF ACTION

COUNT I
FRAUDULENT INDUCEMENT

140.    The preceding paragraphs and allegations are incorporated by reference and realigned as if set out at length herein.

141.    Defendants, by and through the FNRP telemarketing salespersons and representatives, utilized one or more of the above-described unlawful, false, misleading, and unconscionable sales tactics to fraudulently induce Plaintiffs into the purchases of the investments in the LLCs. Specifically, Defendants, through their employees and representatives, intentionally and

fraudulently induced Plaintiffs by misrepresenting (and omitting) material facts prior to and after Defendants investments, which Defendants knew were false at the time they were made with the intent to induce Plaintiffs to invest in the LLCs, including, amongst other falsehoods described above, that:

A.    Defendants' acquired the underlying properties for below market value and, as a result, the LLCs would thus generate continued revenue-streams for Plaintiffs;

B.    Cash distributions were projected to be in the range of 6% or greater annually and that blended returns would be in excess of 12%;

C.    the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment);

D.    Plaintiffs would have access to all of the underlying documents for each deal that they invested in;

E.    Defendants completed thorough due diligence respecting their purchase of the underlying properties (and that the underlying properties were in good, working order);

F.    Defendants failed to clearly and meaningfully disclose the extent and nature of the fees and other forms of profit that they would be extracting from the properties;

G.    Defendants misrepresented that the fees they intended to charge were "competitive with typical private investment partnerships" and were are market rate consistent with those that would be charged by third-parties;

H.    Defendants misrepresented that that they would "exercise good faith and fairness in all dealings affecting the Fund."

I.      Defendants provided Plaintiffs with financial projections on each of the LLCs that were knowingly false and misleading at the time they were made because they were not achievable and lacked a reasonable basis based upon the exorbitant fees charged by Defendants and the inflated valuations of the properties.

142.    Plaintiffs relied upon these representations when deciding to invest in the LLCs.

143.    Defendants made the foregoing misrepresentations and omissions with knowledge that they were false and with the intent to deceive, because they knew that had they accurately disclosed the nature of the investments, neither Plaintiffs nor anyone else would willingly invest because the economics of the deals just did not work.

144.    Had Plaintiffs known about Defendants' conspiracy to fraudulently misrepresent and omit material information related to their LLC investments, described herein, Plaintiffs never would have invested in the LLCs or entered into any agreements with Defendants.

145.    In fact, Defendants, by and through the FNRP telemarketing salespersons, *continued* their fraudulent conspiracy to induce Plaintiffs even  after Plaintiffs' original purchases by providing a "double whammy" of false promises to Plaintiffs: Defendants first prepared false and misleading sales, marketing, and other data, and then Defendants' telemarketing salespersons used one or more of the unconscionable sales tactics described herein to make "follow up" calls to Plaintiffs with additional false information and misrepresentations about their own fraudulent data, in order to entice Plaintiffs into signing agreements and continuing to invest in additional shares of the LLCs (each time making the next LLC investment seem more grand and profitable).

146.    Defendants made the misrepresentations, described herein, with full knowledge that such representations were false when made with the intent to induce Plaintiffs to purchase the investments in the LLC interests, to Plaintiffs' financial detriment and Defendants' financial gain.

As a direct and/or proximate result of Defendants' false and misleading representations (and material omissions) about the investments in the Defendant LLCs, Plaintiff suffered (and continue to suffer) damages in the form of, inter alia, the amounts paid to Defendants for investments in the LLCs, lost profits on what the invested funds would have earned if invested properly, and mental anguish damages.

147.    Defendants, by and through the FNRP telemarketing salespersons and representatives, committed the tort of fraudulent inducement in their verbal and telephonic sales pitches to Plaintiffs through the falsehoods, half-truths, and omissions. Moreover, Defendants' false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiffs rights and interests.

148.    Plaintiffs justifiably relied upon Defendants' material misrepresentations. Absent those falsehoods, Plaintiffs would never have entered into any agreements with Defendants to purchase the investments in the LLCs (and Plaintiffs would not be governed by any of the provisions of those agreements). Accordingly, Defendants' wrongful actions constitute fraudulent inducement under New Jersey law.

## COUNT II
## FRAUD, EQUITABLE FRAUD, AND/OR FRAUDULENT CONCEALMENT

149.    The preceding paragraphs and allegations are incorporated by reference and realigned as if set out at length herein.

150.    Defendants defrauded Plaintiffs pursuant to common law. In order to sell the shares of LLC's to Plaintiffs, Defendants conspired to utilize one or more of the above-described unlawful, false, misleading and unconscionable high-pressure sales tactics. Specifically, Defendants and their telemarketer employees and representatives falsely and/or misleadingly represented to Plaintiffs,

amongst the plethora of falsehoods described above, that:

A.  Defendants' acquired the underlying properties for below market value and, as a result, the LLCs would thus generate continued revenue-streams for Plaintiffs;

B.  Cash distributions were projected to be in the range of 6% or greater annually and that blended returns would be in excess of 12%;

C.  the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment);

D.  Plaintiffs would have access to all of the underlying documents for each deal that they invested in;

E.  Defendants completed thorough due diligence respecting their purchase of the underlying properties (and that the underlying properties were in good, working order);

F.  Defendants failed to clearly and meaningfully disclose the extent and nature of the fees and other forms of profit that they would be extracting from the properties;

G.  Defendants misrepresented that the fees they intended to charge were "competitive with typical private investment partnerships" and were are market rate consistent with those that would be charged by third-parties;

H.  Defendants misrepresented that that they would "exercise good faith and fairness in all dealings affecting the Fund."

I.  Defendants provided Plaintiffs with financial projections on each of the LLCs that were knowingly false and misleading at the time they were made because they were not achievable and lacked a reasonable basis based upon the exorbitant fees charged

by Defendants and the inflated valuations of the properties.

151.    Plaintiffs relied upon these representations when deciding to invest in the LLCs.

152.    Defendants made the foregoing misrepresentations and omissions with knowledge that they were false and with the intent to deceive, because they knew that had they accurately disclosed the nature of the investments, neither Plaintiffs nor anyone else would willingly invest because the economics of the deals just did not work.

153.    As such, Defendants are liable for fraud and fraudulent concealment against Plaintiffs. Defendants had a duty to disclose to Plaintiff based upon their contractual relationships and their role as securities salesman. In addition, or else in the alternative, Defendants had a duty to disclose to Plaintiff based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair.  The "special facts" doctrine is applicable to the present case because the withheld and hidden material information as to the investments in the LLC's at issue was "peculiarly within the knowledge" of Defendants and that the information was not such that could have been discovered by Plaintiff through the exercise of ordinary intelligence and Defendants were acting as unlicensed securities salesman and, therefore, were subject to the duties and standards applicable to FINRA-licensed securities salesman.

154.    Defendants, by and through their employees and representatives, made the herein-detailed false representations (and material omissions) to Plaintiffs with the intent that Plaintiffs relied upon them and with full knowledge that such representations were false when made. Plaintiffs relied on Defendants' material and false representations when deciding to invest in the LLC's.  In fact, they purchased shares in the LLC to their financial detriment and Defendants' financial gain. As a direct and/or proximate result of Defendants' false and misleading representations to Plaintiffs (and

material omissions) concerning Plaintiffs' investments in the LLCs, Plaintiffs suffered (and continue to suffer) damages in the form of, inter alia, the amount of their investments in the LLCs, the amounts paid in fees and commissions to Defendants, as well as consequential damages related to the lost profits, loss of principal, and other statutory damages.

155.    By virtue of the confidential business relationship between Plaintiff and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiff. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiff's rights and interests.

156.    Plaintiffs justifiably relied on Defendants' false representations and/or omissions to their financial detriment by investing in the LLCs. Defendants' wrongful actions constitute fraud at common law and a conspiracy to defraud under RICO.

## COUNT III
## NEGLIGENT MISREPRESENTATION

157.    The preceding factual statements and allegations are incorporated by reference and related as if set out at length herein.

158.    Defendants made certain representations (and material omissions) to Plaintiffs in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently supplied false information that guided Plaintiffs to make investments in the LLCs.

159.    Defendants failed to exercise reasonable care and competence in obtaining, confirming

the accuracy of, and communicating such information to Plaintiffs by, inter alia, utilizing one or more of the herein-described unlawful, false, misleading and unconscionable sales tactics typical of the direct sales industry and/or making the above-described false and material misrepresentations and omissions.

160.     Plaintiffs justifiably relied on Defendants' negligent misrepresentations when investing in the LLCs, which directly and/or proximately caused them each to suffer damages to the financial benefit of Defendants. Plaintiffs continued to justifiably rely upon Defendants' negligent misrepresentations in their oral telephonic representations and various presentations and print advertisements regarding investment in the LLCs, which directly and/or proximately caused them to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New Jersey common law.  Due to Defendants ongoing misrepresentations and concealment, including their failure to provide GAAP financial statements, Plaintiffs did not learn of the scope of the misrepresentations until within two years of filing this suit.

COUNT IV
NEGLIGENCE AND GROSS NEGLIGENCE

161.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

162.     Defendants negligently valued, promoted, marketed, advertised, and sold investments to Plaintiffs in the LLCs. This violated and breached Defendants' duty to Plaintiffs to exercise reasonable care in valuing, promoting, marketing, advertising, and selling the investments to Plaintiffs. Defendants' wrongful conduct directly and/or proximately caused Plaintiffs to suffer damages.  Defendants' wrongful conduct constitutes negligence at common law.

163.    As securities salesman, Defendants had duties to comply with FINRA Rules and Regulation Best Interest, which imposed requirements including ensuring that recommendations are in the best interest of Plaintiffs, considering their investment profile and the characteristics of the recommended security.  Pursuant to Regulation Best Interest, Defendants' salespersons were required to disclose all material facts related to the scope and terms of their relationship with the customer, including any conflicts of interest that might affect their recommendations. They must also exercise reasonable diligence, care, and skill in making recommendations, ensuring that the recommendations are suitable for the customer based on the customer's investment profile.

COUNT V
CONSPIRACY

164.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

165.    Defendants, either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purpose by an unlawful means. As such, Defendants conspired to commit the wrongful actions outlined above, all of which directly and proximately caused Plaintiffs to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy at common law.

COUNT VI
UNJUST ENRICHMENT

166.    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length

167.    A measurable benefit has been conferred on Defendants under such circumstances that Defendants' retention of the benefit without payment to Plaintiffs would be unjust.

52

168.    The benefit is the taking of Plaintiffs' money under false pretenses and not providing Plaintiffs with the revenue stream and increased investment-value, which Plaintiffs were supposed to receive for Plaintiffs' investments in the LLCs.

169.    Defendants' employees and representatives have been unjustly enriched by: (i) being paid fees for investments in the LLCs; (ii) taking salaries for working for the LLCs; (iii) receiving unreasonable commissions related to the tenant leases in the LLCs; (iv) unjustly receiving fees through related entities; and (v) taking a share of the profits of the LLCs. Accordingly, Plaintiffs seek to impose a constructive trust over (and recover) all amounts by which Defendants have been unjustly enriched.

170.    The benefit is measurable because Defendants' have in their possession detailed records concerning their sales of shares to Plaintiffs in the LLCs, including monies Defendants earned.

### COUNT VII
### NEW JERSEY UNIFORM SECURITIES LAW,
### N.J.S. 49:3-47 *ET SEQ.*

171.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

172.    The New Jersey Uniform Securities Law ("NJUSL"), at N.J.S. 49:3-71, provides that it is unlawful to (a) offer, sell or purchase a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), or (b) offer, sell or purchase a security by employing any device, scheme, or artifice to defraud, or (c) offer, sell or purchase a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

173.    Defendants have violated N.J.S. 49:3-71 by selling Plaintiffs the membership interest in the LLCs based upon misrepresentations and omissions of material facts, including false and misleading statements to Plaintiffs that:

A.    Defendants' acquired the underlying properties for below market value and, as a result, the LLCs would thus generate continued revenue-streams for Plaintiffs;

B.    Cash distributions were projected to be in the range of 6% or greater annually and that blended returns would be in excess of 12%;

C.    the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment);

D.    Plaintiffs would have access to all of the underlying documents for each deal that they invested in;

E.    Defendants completed thorough due diligence respecting their purchase of the underlying properties (and that the underlying properties were in good, working order);

F.    Defendants failed to clearly and meaningfully disclose the extent and nature of the fees and other forms of profit that they would be extracting from the properties;

G.    Defendants misrepresented that the fees they intended to charge were "competitive with typical private investment partnerships" and were are market rate consistent with those that would be charged by third-parties;

H.    Defendants misrepresented that that they would "exercise good faith and fairness in all dealings affecting the Fund."

I.    Defendants provided Plaintiffs with financial projections on each of the LLCs that

were knowingly false and misleading at the time they were made because they were

not achievable and lacked a reasonable basis based upon the exorbitant fees charged

by Defendants and the inflated valuations of the properties.

174.   Defendants have violated N.J.S. 49:3-71 by engaging in a scheme or artifice to defraud

Plaintiffs by extracting covert fees and engaging in self-dealing transactions with the LLCs to

enrich themselves to the detriment of Plaintiffs.

175.   The NJUSL, at N.J.S. 49:3-71(c), provides that those who sell securities in violation of

N.J.S. 49:3-71(a), such as Defendants, are liable to the purchasers, such as Plaintiffs for the

consideration paid for the security, together with interest set at the rate established for interest on

judgments for the same period by the Rules Governing the Courts of the State of New Jersey from

the date of payment of the consideration for the security, and costs, less the amount of any income

received on the security, or for damages if he no longer owns the security.

176.   To the extent that the Defendants are not deemed "sellers" within the meaning of N.J.S.

49:3-71(a), they are also liable for violating N.J.S. 49:3-71(d), which provides that every person

who directly or indirectly controls a seller liable under N.J.S. 49:3-71(a), every partner, officer, or

director of such a seller, every person occupying a similar status or performing similar functions,

every employee of such a seller or investment adviser who materially aids in the sale or in the

conduct giving rise to the liability, is liable jointly and severally with and to the same extent as the

seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and

in the exercise of reasonable care could not have known, of the existence of the facts which give

rise to liability.

177.   Each of the Defendants had control over the FNRP, the individual salespersons, and/or the

LLCs who constitute "sellers" under N.J.S. 49:3-71(a) and/or constitute officers, directors,

members, or managers of such sellers and, thus, are liable pursuant to N.J.S. 49:3-71(d).

178.    The membership interest in the LLCs sold to Plaintiffs constitute securities within the meaning of the NJUSL and the overall scheme in which Plaintiffs were induced to invest constitutes a scheme or artifice to defraud involving the sale of securities.

COUNT VIII

VIOLATION OF FLORIDA SECURITIES AND INVESTOR PROTECTION ACT
FLORIDA STATUTE 517.011 *ET SEQ.*

179.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

180.    The Florida Securities and Investor Protection act is applicable to claims by Plaintiffs McGrath, Dashefsky and Windish because they are citizens of Florida who were solicited to invest while in Florida.  It is also applicable to claims by Jeffrey Lapietra related to the Davenport MF Realty Fund, LLC because that fund is invested in real estate located in Florida.  The following allegations relate to sales to McGrath and Shah, as well as sales of Davenport MF Realty Fund, LLC to Lapietra.

181.    Defendants violated Florida Statute § 517.301(1)(a) by selling LLC interests based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

182.    Defendants violated Florida Statute § 517.301(1)(b) by selling LLC interests by use of advertisements and communications describing such LLC interests without fully disclosing the receipt, whether past or prospective, of consideration received by Defendants and the amount of

the consideration, including the fees and other compensation received from the LLCs and bonus pool commissions, all as described above.

183.    Defendants violated Florida Statute § 517.12 by and through the sale of securities to Plaintiffs McGrath and Shah by unlicensed securities salesman. Subsequent to their purchase of the LLC interests at issue, and within two years of the filing of this suit, Plaintiffs McGrath and Shah learned that, upon information and belief, salesman employed by FNRP were paid transaction-based compensation under the guise of a bonus pool in an attempt to circumvent state and federal registration requirements for securities salesman. In fact, such compensation triggered registration requirements for FNRP and the salesmen it employed. As a result, the FNRP and its salesman who sold the LLC interests to McGrath, Shah and Windish are in violation of Florida Statute § 517.12 through the sale of securities by unlicensed securities salesman.

184.    Pursuant to Florida Statute § 517.211, McGrath, Shah, Windish and Lapietra are entitled to recover the consideration paid for the security or investment, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

185.    To the extent that they are not primary violators pursuant to §§ 517.301 and 517.12, pursuant to Florida Statute § 517.12(2) & (3), Defendants are each liable to the same extent as the primary violators as control persons and/or material participants in the transactions and the scheme to defraud.

COUNT IX
VIOLATION OF TEXAS SECURITIES ACT,
V.T.C.A., GOVERNMENT CODE § 4001.001, *ET SEQ*.

186.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

187.    The Texas Securities Act is applicable to the sale of LLC interests in Champions Village Realty Fund LLC because the real estate in which Champions Village Realty Fund LLC was invested was located in Texas.

188.    Defendants violated Texas Securities Act, TX GOVT § 4008.052, by selling LLC interests in Champions Village Realty Fund LLC to Plaintiffs by means of an untrue statements of a material fact and omissions to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

189.    Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

190.    To the extent that they are not primary violators pursuant to § 4008.052, pursuant to TX GOVT § 4008.055, Defendants are each liable to the same extent as the primary violators as control persons and as persons who materially aided in the transactions and the scheme to defraud, with either the intent to deceive Plaintiffs or a reckless disregard for the truth.

COUNT X
VIOLATION OF GEORGIA SECURITIES ACT,
GA. CODE § 10-5-50, *ET SEQ.*

191.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

192.    The Georgia Securities Act is applicable to the sale of LLC interests in CRS Center Realty Fund, LLC because the real estate in which that LLC is invested is located in Georgia.

193.    Defendants violated the Georgia Securities Act, at Ga. Code § 10-5-50 by selling LLC interests in CRS Center Realty Fund, LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

194.    Pursuant the Georgia Securities Act, at Ga. Code § 10-5-58, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

195.    Pursuant the Georgia Securities Act, at Ga. Code § 10-5-58, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

196.    Pursuant the Georgia Securities Act, at Ga. Code § 10-5-58, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees

or persons associated with the primary violators who materially participated in the conduct giving rise to liability.

COUNT XI

VIOLATION OF NEW HAMPSHIRE UNIFORM SECURITIES ACT,
N.H. REV. STAT. § 421-B:1-101, *ET SEQ*.

197.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

198.    The New Hampshire Uniform Securities Act is applicable to the sale of LLC interests in Northeast Plaistow Fund LLC and Northeast Realty Fund, LLC because the real estate in which that LLC is invested is located in New Hampshire.  It is also applicable to claims by Plaintiff Bear Foley LLC because it is a New Hampshire limited liability company and its member is a New Hampshire citizen who was in New Hampshire when Defendants sold Bear Foley the LLC interests and made the relevant misrepresentations and omissions.

199.    Defendants violated the New Hampshire Uniform Securities Act, at N.H Rev. Stat. § 421-B:5-501, by selling LLC interests to Bear Foley LLC and interest in Northeast Plaistow Fund LLC and Northeast Realty Fund, LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

200.    Defendants are also liable to Plaintiff Bear Foley LLC for selling securities in violation of registration requirements in violation of RSA 421-B:4-401(a) and RSA 421-B:4-402(a.

201.    Pursuant the New Hampshire Uniform Securities Act, at N.H Rev. Stat. § 421-B:5-509, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

202.    Pursuant the New Hampshire Uniform Securities Act, at N.H Rev. Stat. § 421-B:5-509(g), to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

203.    Pursuant the New Hampshire Uniform Securities Act, at N.H Rev. Stat. § 421-B:5-509(g), to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially participated in the conduct giving rise to liability.

## COUNT XII
## VIOLATION OF CONNECTICUT UNIFORM SECURITIES ACT,
## C.G.S. § 36B-2, *ET SEQ.*

204.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

205.    The Connecticut Uniform Securities Act is applicable to the sale of LLC interests in Bishops Corner SC Realty Fund LLC, Sand Hill Plaza Realty Fund LLC, and Sand Hill Plaza TIC 4 Member LLC because the real estate in which those LLCs are invested is located in Connecticut.

206.    Defendants violated the Connecticut Uniform Securities Act, at C.G.S. § 36b-29, by selling LLC interests in Bishops Corner SC Realty Fund LLC and Sand Hill Plaza Realty Fund

LLC to Plaintiffs based upon intentional and fraudulent misrepresentations and omissions of material facts, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

207.    Pursuant the Connecticut Uniform Securities Act, at C.G.S. § 36b-29, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

208.    Pursuant the Connecticut Uniform Securities Act, at C.G.S. § 36b-29, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

209.    Pursuant the Connecticut Uniform Securities Act, at C.G.S. § 36b-29, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially participated in the conduct giving rise to liability.

COUNT XIII
VIOLATION OF OHIO SECURITIES ACT, R.C. § 1707.01, *ET SEQ*.

210.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

211.    The Ohio Securities Act is applicable to the sale of LLC interests in Southland Crossing Realty Fund, LLC and CS Center Realty Fund LLC because the real estate in which those LLCs are invested is located in Ohio.  It is also applicable to the sale of interests in First National Realty

Partners Fund IV LLC related to Carriage Place Shopping Center, because that center is located in Ohio.

212.     Defendants violated the Ohio Securities Act, at R.C. § 1707.41, by selling LLC interests in Southland Crossing Realty Fund, LLC, CS Center Realty Fund LLC, and First National Realty Partners Fund IV LLC to Plaintiffs based upon misrepresentations and omissions of material facts in the offering memorandum and written marketing material, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

213.     Pursuant the Ohio Securities Act, at R.C. § 1707.43, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

214.     Pursuant Ohio Securities Act, at R.C. § 1707.41, to the extent that they are not "sellers", each Defendant that is a director of FNRP, FNPM and/or FNRA is liable to the same extent as FNRP, FNPM and/or FNRA.

215.     Pursuant the Ohio Securities Act, at R.C. § 1707.43, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as persons who participated in or aided the primary violators in selling such investments.

COUNT XIV
VIOLATION OF OKLAHOMA UNIFORM SECURITIES ACT,
71 O.S. § 1-101, *ET SEQ*.

216.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

217.    The Oklahoma Uniform Securities Act is applicable to the sale of LLC interests in SS Tulsa Center Realty Fund, LLC because the real estate in which that LLC invested is located in Oklahoma.

218.    Defendants violated the Oklahoma Uniform Securities Act, at 71 O.S. § 1-501 and 71 O.S. § 1-509, by selling LLC interests in SS Tulsa Center Realty Fund, LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

219.    Pursuant the Oklahoma Uniform Securities Act, at 71 O.S. § 1-509, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

220.    Pursuant the Oklahoma Uniform Securities Act, at 71 O.S. § 1-509, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

221.    Pursuant the Oklahoma Uniform Securities Act, at 71 O.S. § 1-509, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially participated in the conduct giving rise to liability.

COUNT XV
VIOLATION OF PENNSYLVANIA SECURITIES ACT,
70 P.S. § 1-501, *ET SEQ*.

222.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

223.    The Pennsylvania Securities Act is applicable to the sale of LLC interests in Dauphin Plaza Realty Fund, LLC, Dauphin Plaza TIC 3 Member LLC, Summerdale Plaza Realty Fund, LLC and Village at Pitt Mills Realty Fund LLC because the real estate in which those LLCs invested is located in Pennsylvania.  The Pennsylvania Securities Act is also applicable to all sales of LLC interests to Plaintiff GISIM Properties LLC because it is a Pennsylvania limited liability company and it managing-member, Simeon Gomelsky, was located in Pennsylvania at all relevant times, including when GISIM Properties LLC purchased the securities and when Defendants made the relevant misrepresentations and omissions.

224.    Defendants violated the Pennsylvania Securities Act, at 70 P.S. § 1-501, by selling LLC interests in Dauphin Plaza Realty Fund, LLC, Dauphin Plaza TIC 3 Member LLC, Summerdale Plaza Realty Fund, LLC  and Village at Pitt Mills Realty Fund LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

225.    Defendants violated the Pennsylvania Securities Act, at 70 P.S. § 1-301, by selling LLC interests to Plaintiff GISIM Properties LLC without being registered as securities dealers or salesman in the State of Pennsylvania.

226.     Pursuant the Pennsylvania Securities Act, at 70 P.S. § 1-501, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

227.     Pursuant the Pennsylvania Securities Act, at 70 P.S. § 1-503, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

228.     Pursuant the Pennsylvania Securities Act, at 70 P.S. § 1-503, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially aided in the conduct giving rise to liability.

### COUNT XVI
### VIOLATION OF MICHIGAN UNIFORM SECURITIES ACT,
### M.C.L. § 451.2101, *ET SEQ.*

229.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

230.     The Michigan Uniform Securities Act is applicable to the sale of LLC interests in PC Center Realty Fund LLC because the real estate in which that LLC invested is located in Michigan.

231.     Defendants violated the Michigan Uniform Securities Act, at M.C.L. §§ 451.2501 & 451.2509, by selling LLC interests in PC Center Realty Fund LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to

defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

232.    Pursuant the Michigan Uniform Securities Act, at M.C.L. § 451.2509, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

233.    Pursuant the Michigan Uniform Securities Act, at M.C.L. § 451.2509, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

234.    Pursuant the Michigan Uniform Securities Act, at M.C.L. § 451.2509, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially aided in the conduct giving rise to liability.

COUNT XVII
VIOLATION OF MISSOURI SECURITIES ACT OF 2003,
V.A.M.S. § 409.1-101, *ET SEQ*.

235.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

236.    The Missouri Securities Act is applicable to the sale of LLC interests in Mid-America Grocery SC Realty Fund LLC because one of the pieces of real estate in which that LLC invested is located in Missouri. The Missouri Securities Act is applicable to the sale of LLC interests in First

National Realty Partners Fund IV, LLC related to the Mark Twain Village property that is located in Missouri.

237.     Defendants violated the Missouri Uniform Securities Act, at V.A.M.S. §§ 409.5-501 & 409.5-509, by selling LLC interests in Mid-America Grocery SC Realty Fund LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

238.     Pursuant the Missouri Uniform Securities Act, at V.A.M.S. § 409.5-509, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

239.     Pursuant the Missouri Uniform Securities Act, at V.A.M.S. § 409.5-509, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

240.     Pursuant the Missouri Uniform Securities Act, at V.A.M.S. § 409.5-509, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially aided in the conduct giving rise to liability.

COUNT XVIII
VIOLATION OF INDIANA UNIFORM SECURITIES ACT,
I.C § 23-19-1-1, *ET SEQ*.

241.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

242.    The Indiana Uniform Securities Act is applicable to the sale of LLC interests in Mid-America Grocery SC Realty Fund LLC because one of the pieces of real estate in which that LLC invested is located in Indiana.  The Indiana Uniform Securities Act is applicable to the sale of LLC interests to DiN Properties LLC, because it is an Indiana limited liability company and its member is an Indiana citizen who was in Indiana when Defendants sold DiN Properties the LLC interests and made the relevant misrepresentations and omissions.

243.    Defendants violated the Indiana Uniform Securities Act, at IC 23-19-5-1, by selling LLC interests based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, and engaging in acts, practices and course of business that operate as a fraud or deceit upon Plaintiffs, including the same facts giving rise to the above Counts for violations of state securities statutes.

244.    Defendants violated the Indiana Uniform Securities Act, at IC 23-19-4-2, by selling LLC interests to DiN Properties LLC without being licensed as securities dealers or salesmen in the state of Indiana in violation of IC 23-19-4-1 and 23-19-4-2.

245.    Pursuant the Indiana Uniform Securities Act, at IC 23-19-5-9, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at eight percent per annum

from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

246.     Pursuant the Indiana Uniform Securities Act, at IC 23-19-5-9, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions of the primary violators, or employees or associated persons who materially aided in the conduct giving rise to liability.

COUNT XIX
VIOLATION OF NEVADA SECURITIES LAW,
N.R.S § 90.211, *ET SEQ.*

247.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

248.     The Nevada Securities Law is applicable to the sale of LLC interests in Tropicana Centre LV Realty Fund LLC because the real estate in which that LLC invested is located in Nevada.

249.     Defendants violated the Nevada Securities Law, at N.R.S. § 90.570, by selling LLC interests in Tropicana Centre LV Realty Fund LLC to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the same facts giving rise to the above Counts for violations of state securities statutes.

250.     Pursuant the Nevada Securities Law, at N.R.S. § 90.660, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

251.    Pursuant the Nevada Securities Law, at N.R.S. § 90.660, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

252.    Pursuant the Nevada Securities Law, at N.R.S. § 90.660, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially aided in the conduct giving rise to liability.

COUNT XX
VIOLATION OF ILLINOIS SECURITIES LAW of 1953,
815 ILCS 5/1, *ET SEQ.*

253.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

254.    The Illinois Securities Law is applicable to the sale of LLC interests in Maple Park SC Realty Fund, LLC, Maple Park SC TIC 9 Member LLC, Maple Park SC TIC 11 Member LLC, and Maple Park SC TIC 12 Member LLC because the real estate in which that LLC invested is located in Illinois.  The Illinois Securities Law is also applicable to claims by Plaintiffs Snyder, Lapietra, and Shah, because they are a citizen of Illinois and was located in Illinois when Defendants solicited their investments.

255.    Defendants violated the Illinois Securities Law, at 815 ILCS 5/12, by selling LLC interests to Plaintiffs based upon misrepresentations and omissions of material facts, engaging in practices or courses of business in connection with the sale such LLC interests which worked a fraud or deceit upon the purchaser, and circulating offering materials pertaining to the LLC interests that

containing misrepresentations, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

256.    Defendants violated the Illinois Securities Law, at 815 ILCS 5/12, by selling LLC interests to Plaintiffs Snyder, Lapietra, and Shah based upon misrepresentations and omissions of material facts, engaging in practices or courses of business in connection with the sale such LLC interests which worked a fraud or deceit upon the purchaser, and circulating offering materials pertaining to the LLC interests that containing misrepresentations, including by the same facts giving rise to the above Counts for violations of state securities statutes.

257.    Defendants also violated the Illinois Securities Law, at 815 ILCS 5/8, by selling LLC interests to Plaintiffs Snyder, Lapietra, and Shah without being registered as securities dealers or salesman in the State of Illinois and employing unlicensed salespersons to work on their behalf.

258.    Pursuant the Illinois Securities Law, at 815 ILCS 5/13, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

259.    Pursuant the Illinois Securities Law, at 815 ILCS 5/13, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, that participated in or aided the sales.

COUNT XXI
VIOLATION OF ALABAMA SECURITIES ACT,
ALA. CODE 1975 § 8-6-1, *ET SEQ*.

260.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

261.    The Alabama Securities Act is applicable to the sale of LLC interests in Tannehill Realty Fund LLC, Brook Highland Realty Fund, LLC, Inverness Corners SC Realty Fund, LLC, and Inverness Corners TIC 4 Member LLC, Inverness Corners TIC 10 Member LLC because the real estate in which those LLCs invested is located in Alabama.

262.    Defendants violated the Alabama Securities Act, at Ala. Code § 8-6-19, by selling the LLC interests to Plaintiffs based upon misrepresentations and omissions of material facts and the use of devices, schemes and artifices to defraud, including the same facts giving rise to the above Counts for violations of state securities statutes.

263.    Pursuant the Alabama Securities Act, at Ala. Code § 8-6-19, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

264.    Pursuant the Alabama Securities Act, at Ala. Code § 8-6-19, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, to the same extent as the "sellers".

265.    Pursuant the Alabama Securities Act, at Ala. Code § 8-6-19, to the extent that they are not "sellers", Defendants are also each liable to the same extent as the primary violators as employees or persons associated with the primary violators who materially aided in the conduct giving rise to liability.

## COUNT XXII
## VIOLATION OF SECURITIES ACT OF NEBRASKA,
### NEB. REV. ST. § 8-1101, *ET SEQ.*

266.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

267.    The Securities Act of Nebraska is applicable to the sale of LLC interests in Grayhawk SC Realty Fund, LLC and Grayhawk SC TIC 4 Member LLC because the real estate in which those LLCs invested is located in Nebraska.

268.    Defendants violated the Securities Act of Nebraska, at Neb. Rev, St. § 8-118, by selling the LLC interests to Plaintiffs based upon misrepresentations and omissions of material facts, including the same facts giving rise to the above Counts for violations of state securities statutes.

269.    Pursuant the Securities Act of Nebraska, at Neb. Rev, St. § 8-118, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

270.    Pursuant the Securities Act of Nebraska, at Neb. Rev, St. § 8-118, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding

similar positions, and/or employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

COUNT XXIII
VIOLATION OF MINNESOTA SECURITES ACT,
MINN. STAT. § 80A.41 *ET SEQ*.

271.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

272.     The Minnesota Securities Act is applicable to the sale of LLC interests to Plaintiff Jeffrey Johnson because he is a citizen of Minnesota and was in Minnesota at all relevant times, including when he purchased the LLC interests and when Defendants made the misrepresentation and omissions.

273.     Defendants violated the Minnesota Securities Act, at Minn. Stat. § 80A.76 Section 509 by selling the LLC interests to Plaintiffs based upon misrepresentations and omissions of material facts, including the same facts giving rise to the above Counts for violations of state securities statutes.

274.     Defendants violated the Minnesota Securities Act, at Minn. Stat. § 80A.76 Section 509 by selling the LLC interests to Plaintiff Johnson without being registered as securities dealers or salesmen in the State of Minnesota.

275.     Pursuant the Minnesota Securities Act, at Minn. Stat. § 80A.76 Section 509, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

276.     Pursuant the Minnesota Securities Act, at Minn. Stat. § 80A.76 Section 509, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, and/or employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

COUNT XXIV
VIOLATION OF MISSISSIPPI SECURITES ACT OF 2010,
MISS. CODE §75-71-101 *ET SEQ*.

277.     The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

278.     The Mississippi Securities Act is applicable to the sale of LLC interests to Plaintiff Joel Groshong because he is a citizen of Mississippi and was in Mississippi at all relevant times, including when he purchased the LLC interests and when Defendants made the misrepresentation and omissions.

279.     Defendants violated the Mississippi Securities Act, at Miss. Code § 75-71-509 by selling the LLC interests to Plaintiff Groshong based upon untrue statements and omissions of material facts, including the same facts giving rise to the above Counts for violations of state securities statutes.

280.     Pursuant the Mississippi Securities Act, at Miss. Code § 75-71-509, Plaintiff Groshong is entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

281.    Pursuant the Mississippi Securities Act, at Miss. Code § 75-71-509, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, and/or employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

## COUNT XXV
## VIOLATION OF UTAH UNIFORM SECURITES ACT,
## U.C.A. §61-1-1 *ET SEQ.*

282.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

283.    The Utah Uniform Securities Act is applicable to the sale of LLC interests to Plaintiff Timothy Larsen because he is a citizen of Utah and was in Utah at all relevant times, including when he purchased the LLC interests and when Defendants made the misrepresentation and omissions.

284.    Defendants violated the Utah Uniform Securities Act, at U.C.A. § 61-1-1 by selling the LLC interests to Plaintiff Larsen based upon untrue statements and omissions of material facts, including the same facts giving rise to the above Counts for violations of state securities statutes.

285.    Defendants violated the Utah Uniform Securities Act, at U.C.A. § 61-1-3 by selling the LLC interests to Plaintiff Larsen without being licensed in Utah as securities dealers or salesmen.

286.    Pursuant the Utah Uniform Securities Act, at U.C.A. § 61-1-22, Plaintiff Larsen is entitled to recover the consideration paid for the securities, plus interest thereon at twelve percent per

annum from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

287.    Pursuant the Utah Uniform Securities Act, at U.C.A. § 61-1-22, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or managing partners, executive officers, directors, managers, or persons holding similar positions, and/or employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

COUNT XXVI
CALIFORNIA CORPORATE SECURITIES LAW OF 1968, §§ 25401, 25404, 25501 & 25501.05

288.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

289.    The California Corporate Securities Law of 1968 is applicable to claims regarding the Heritage Park SC Realty Fund LLC because that LLC invested in real estate located in California. The California Corporate Securities Law of 1968 is also applicable to claims by Herrera & Saenz Properties, LLC because it is a California limited liability company and its members were located in California when they made the investments and when Defendants made the misrepresentation and omissions that are the subject of this litigation.

290.    Defendants violated Cal. Corp. Code § 25401 by selling the LLC interests by means of written or oral communications that included untrue statements of a material fact and omitted to state a material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading, including the misrepresentations and omissions alleged in connection with the claims pursuant to the NJUSL as set forth in Count VII above.

291.    Pursuant to Cal. Corp. Code § 25501, Defendants are liable to Plaintiffs for rescission and/or for damages for violating Cal. Corp. Code § 25401. Upon rescission, Plaintiffs may recover the consideration paid for the LLC investments, plus interest at the legal rate, less the amount of any income received on the security. In addition Plaintiffs may recover their reasonable attorney's fees and costs.

292.    To the extent that any Defendants are not liable as "sellers" pursuant to Cal. Corp. Code § 25401, they are liable to the same extent as such seller pursuant to Cal. Corp. Code § 25504 because they directly or indirectly control FNRP, FNRA, FNPM and the individual securities salesman who solicited Plaintiffs or are officers, directors, members, managers or persons holding similar status of FNRP, FNRA, FNPM and the other entities that participated in the sale and issuance of the LLC interests to Plaintiffs and/or materially aided in such sales through their employment by FNRP, FNRA, FNPM and their affiliates.

293.    Subsequent to their purchase of the LLC interests at issue, and within two years of the filing of this suit, Plaintiff Herrera & Saenz Properties, LLC learned that, upon information and belief, salesman employed by FNRP were paid transaction-based compensation under the guise of a bonus pool in an attempt to circumvent state and federal registration requirements for securities salesman. In fact, such compensation triggered registration requirements for FNRP and the salesmen it employed. As a result, the FNRP and its salesman who sold the LLC interests to Herrera & Saenz Properties, LLC are in violation of Cal. Corp. Code § 25501.05 through the sale of securities by unlicensed securities salesman.

294.    As a result of the violation, Defendants are liable to Herrera & Saenz Properties, LLC for the consideration paid for the LLC interests plus interest at the legal rate, less the amount of any income received on the securities, attorneys' fees and costs.

295.    The individual Counterclaim-Defendants and FNRP are each also liable to the same extent as the primary violators as control persons pursuant to Cal. Corp. Code § 25504.

COUNT XXVII
VIOLATION OF TENNESSEE SECURITES ACT OF 1980,
T.C.A. §48-1-101 *ET SEQ.*

296.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

297.    The Tennessee Securities Act is applicable to the sale of LLC in HH Center Realty Fund LLC, because that LLC is invested in commercial real estate located in Tennessee.

298.    Defendants violated the Tennessee Securities Act, at T.C.A. §§ 48-1-121 and 48-1-122, by selling the LLC interests based upon untrue statements and omissions of material facts and devices, schemes, and artifices to defraud, including the same facts giving rise to the above Counts for violations of state securities statutes.

299.    Pursuant the Tennessee Securities Act, at T.C.A. § 48-1-122, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

300.    Pursuant the Tennessee Securities Act, at T.C.A. § 48-1-122, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control

persons and/or partners, executive officers, directors, managers, or persons holding similar positions, and/or employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

COUNT XXVIII
VIOLATION OF DELAWARE SECURITES ACT,
6 DEL.C. §73-101 *ET SEQ.*

301.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

302.    The Delaware Securities Act is applicable to the sale of LLC in Cristina Crossing SC TIC 8 Member, LLC and Cristina Crossing SC TIC 11 Member, LLC, because those LLCs invested in commercial real estate located in Delaware.

303.    Defendants violated the Delaware Securities Act, at 6 Del.C. § 73-605, by selling the LLC interests based upon untrue statements and omissions of material facts, including the same facts giving rise to the above Counts for violations of state securities statutes.

304.    Pursuant the Delaware Securities Act, at 6 Del.C. § 73-605, Plaintiffs are entitled to recover the consideration paid for the securities, plus interest thereon at the legal rate from the date of purchase, less the amount of any income received by the purchaser on the security, as well as costs and attorneys' fees.

305.    Pursuant the Delaware Securities Act, at 6 Del.C. § 73-605, to the extent that they are not "sellers", Defendants are each liable to the same extent as the primary violators as control persons and/or partners, officers, directors, managers, or persons holding similar positions, and/or

employees or associated persons of the primary violator who materially aided in the conduct giving rise to liability.

## COUNT XXIX
## VIOLATION SECTION 10(b) OF THE SECURITIES
## EXCHANGE ACT OF 1934, 15 U.S.C. § 78j(b), *ET SEQ.*

306.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

307.    Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 because Defendants, in connection with the sale of LLC interests to Plaintiffs, by the use of means and instrumentalities of interstate commerce, employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made not misleading; and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs.

308.    The misrepresentations and omissions of material facts by Defendants, included false and misleading statements to Plaintiffs that:

A.    Defendants' acquired the underlying properties for below market value and, as a result, the LLCs would thus generate continued revenue-streams for Plaintiffs;

B.    Cash distributions were projected to be in the range of 6% or greater annually and that blended returns would be in excess of 12%;

C.    the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment);

D.    Plaintiffs would have access to all of the underlying documents for each deal that they invested in;

E.  Defendants completed thorough due diligence respecting their purchase of the underlying properties (and that the underlying properties were in good, working order);

F.  Defendants failed to clearly and meaningfully disclose the extent and nature of the fees and other forms of profit that they would be extracting from the properties;

G.  Defendants misrepresented that the fees they intended to charge were "competitive with typical private investment partnerships" and were are market rate consistent with those that would be charged by third-parties;

H.  Defendants misrepresented that that they would "exercise good faith and fairness in all dealings affecting the Fund."

I.  Defendants provided Plaintiffs with financial projections on each of the LLCs that were knowingly false and misleading at the time they were made because they were not achievable and lacked a reasonable basis based upon the exorbitant fees charged by Defendants and the inflated valuations of the properties.

309.  Defendants acted with scienter in that they knew or recklessly disregarded that the representations were materially false and misleading, including ignoring advice from their own compliance officers that the statements may violate the Exchange Act.

310.  Plaintiffs justifiably relied upon the above misrepresentations and omissions when deciding to invest in the LLCs and, as a result, sustained damages in the form of loss of principal, overpayment for the LLC interests, lost profits, and such other damages as may be proven at trial. Plaintiffs are also entitled to recover interest, costs and reasonable attorney's fees.

COUNT XXX
VIOLATION OF NEW JERSEY CRIMINAL JUSTICE
ACT OF 1970, N.J.S. 2C:41-1, *ET SEQ.*

311.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

312.    Plaintiffs have been damaged in their business or property by reason of a violation of N.J.S. 2C:41-2 and, pursuant N.J.S. § 2C:41-4, may sue and shall recover threefold any damages they sustained and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation.

313.    FNRP, FNPM, and FNRA are racketeering enterprises within the meaning of N.J.S. § 2C:41-1c and the individual Defendants are employees, officers, or affiliates of those enterprises.

314.    Defendants have violated N.J.S. 2C:41-2 by receiving income, including the fees, carried interests in the LLCs, and proceeds from self-dealing transactions discussed above, derived, directly or indirectly, from a pattern of racketeering activity, as described herein, in which the Defendants have participated as a principal within the meaning of N.J.S. 2C:2-6 to use or invest, directly or indirectly, any part of the income, or the proceeds of the income, in acquisition of any interest in, or the establishment and operation of FNRP, FNPM, and FNRA and their affiliates, as well as acquiring carried interests in the LLCs.

315.    Defendants have violated N.J.S. 2C:41-2 by acquiring and maintaining carried interests in the LLCs through a pattern of racketeering activity, as described below.

316.    The Individual Defendants have violated N.J.S. 2C:41-2 by being employed by or associated with the Enterprises Defendants FNRP, FNRA and FNPM.

317.    Defendants have engaged in a pattern of racketeering activity by (a) engaging in the acts of fraud described in the above Counts; and (b) engaging in the acts of securities fraud, including

the sale of the LLC interest to Plaintiffs, as described in the above Counts.

318.    The pattern of racketeering activity was for the purpose of conducting the business of the enterprise Defendants FNRP, FNPM, and FNRA and the individual Defendants conspired with the enterprises to conduct and perpetuate that activity, thereby resulting in damages to Plaintiffs in the form of loss of principal invested in the LLCs, lost profits, mental anguish, and other harm as will be demonstrated at trial.

COUNT XXXI
RESPONDEAT SUPERIOR

319.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

320.    Defendants, including but not limited to, FNRP, FNPM, and FNRA,  are also liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' and representatives' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees/representatives were hired (*i.e.*, selling investments in the  LLCs to customers like Plaintiffs)— all of which directly and/or proximately caused Plaintiffs to suffer damages to the financial benefit of Defendants—and for which Defendants are liable under the doctrine of *respondeat superior*.

COUNT XXIV
MAIL FRAUD AND WIRE FRAUD
*(A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, et seq.)*

321.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

322.    This Count is brought in the alternative in the event that the conduct described above is

not deemed actionable under the securities laws or there is a criminal conviction for securities fraud.

323.    By engaging in the above-described open-ended actions and misrepresentations – which also was a consistent, regular, and dominant part of the manner in which the Individual Defendants participated in and conducted the day-to-day business affairs of FNRP (RICO Enterprise), FNPM (RICO Enterprise) and FNRA (RICO Enterprise) – the Defendants instigated, perpetrated, and executed a scheme to defraud Plaintiffs and numerous other of Defendants' telemarketing customers; to wit: the Individual Defendants, individually or in concert, and by or through representatives and employees of the RICO Enterprises (FNRP, FNPM, and FNRA), engaged in repeated and systematic conspiracy to commit mail fraud and wire fraud (as described above), in violation of 18 U.S.C. §§ 1341; 1343, that generated multiple and repeated unlawful investments by Plaintiffs and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for Defendants.[29]

324.    The Individual Defendants caused the RICO Enterprises to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts, and/or purchase confirmations to Plaintiffs and other telemarketing customers for the above-described transactions. As such, the Individual Defendants conducted and/or participated in the business and financial affairs of the RICO Enterprises through a pattern of racketeering activity (i.e. repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343), as described above,

---

[29] Upon information and belief, the RICO Defendants conducted their business and financial affairs through an open-ended and/or closed pattern of racketeering activity as set forth herein. At all relevant times, the RICO Defendants wrongful actions were committed willfully, maliciously, fraudulently, and with intent to injure and damage Plaintiffs, and with reckless disregard of their legal rights. The Defendants' relationship with Plaintiffs does not represent a one-off transaction but rather were representative of and were part and parcel of the RICO Defendants' normal pattern and scheme through which they have defrauded – and continue to defraud – other unsuspecting consumers out of millions of dollars.

that generated multiple and repeated unlawful sales to Plaintiffs and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for them.

325.     The Individual Defendants committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud – generating exorbitant compensation for themselves. By their unlawful actions, therefore, they (i) conducted and/or participated in the affairs of FNRP, FNPM, and FNRA (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others  to violate 18 U.S.C. § 1962(b); (iii) and defrauded Plaintiffs and numerous other of Defendants' telemarketing customers in the process, in violation of 18 U.S.C. §1962(d).[30]

326.     The multiple, repeated, and continuous acts of mail fraud and/or wire fraud described above, plus the active marketing and fraudulent sales to countless other victims over the course of numerous years, constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about the Individual Defendants' schemes to defraud Plaintiffs and numerous other Defendants' telemarketing customers indicated that the scheme would ever terminate. Moreover, and independent of the duration of the scheme, their wrongful acts were and are a consistent, regular,

---

[30] Defendants maliciously conspired to defraud Plaintiffs, in violation of RICO, and Securities and Exchange Commission ("SEC") Regulations by, amongst the plethora of reasons discussed below, and upon information and belief:

(i) paying illegal commissions to their salespersons  in violation of SEC Regulation D;
(ii) overvaluing the Underlying Properties in order to fraudulently abscond with the difference from Plaintiffs' investments;
(iii) making unauthorized transfers to themselves and commingled funds;
(iv) fraudulently skimming from Plaintiffs more than half of the returns from the Underlying Properties by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false.

See Dr. Craig McCann, SLCG Economic Consulting: First Realty Partners Reg D Offerings: Muppets Do Commercial Real Estate by Dr. at 3-4  ("Dr. McCann Article") (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann ) ("FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself.") Contra FNRP's Marketing and Sales Materials, https://fnrpusa.com/fnrp360/  (FNRP video where Defendants falsely state that Defendants "secure properties both on-market and off-market, at or below market value . . . ).

and dominant part of the manner in which they participate in and conduct the day-to-day business and financial affairs of the RICO Enterprises, FNRP, FNPM, and FNRA.

## COUNT XXIX
## VIOLATION OF 18 U.S.C. § 1962(c)

327.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

328.    This Count is brought in the alternative in the event that the conduct described above is not deemed actionable under the securities laws or there is a criminal conviction for securities fraud.

329.    Defendants FNRP, FNPM, and FNRA are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d).

330.    The Individual Defendants are each "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

331.    Individual Defendants conducted and/or participated in the business and financial affairs of FNRP (RICO Enterprise), FNPM (RICO Enterprise), and FNRA (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

332.    The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) by Individual Defendants proximately and/or directly caused Plaintiffs to suffer injury within the meaning of 18 U.S.C. § 1964(c); to wit, Plaintiffs was damaged by, inter alia, the fraudulent representations made by Defendants and the corresponding mental anguish they suffer. Individual

Defendants committed these substantive RICO offenses by using FNRP, FNPM, and/or FNRA to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud – generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Plaintiffs and numerous other Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

COUNT XXXII
VIOLATION of 18 U.S.C. § 1962(d) by
CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)

333.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

334.    This Count is brought in the alternative in the event that the conduct described above is not deemed actionable under the securities laws or there is a criminal conviction for securities fraud.

335.    FNRP, FNPM, and FNRA are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d). The Individual Defendants are each "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); and 1962(d).

336.    The Individual Defendants conspired with other persons within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of FNRP (RICO Enterprise), FNPM (RICO Enterprise) and FNRA (RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§

1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

337.    The Individual Defendants' pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(d) were the causes-in-fact and proximate cause of Plaintiff's suffering injury to his business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit: Plaintiffs was damaged by, inter alia, the fraudulent representations made by the Defendant. The Individual Defendants, themselves and through their representatives agreed to commit these substantive RICO offenses by using the RICO Enterprises (FNRP, FNPM, and/or FNRA) to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud – generating exorbitant compensation for themselves. They knew their tactics and marketing practices were misleading and unlawful and would cause Plaintiffs and numerous other Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful activity.

## RELIEF REQUESTED

338.    RECISSION. Based on Defendants' above-described wrongful conduct, Plaintiffs are entitled to full recission of the LLC investments at issue, which Defendants conspired to fraudulently market and sell to Plaintiffs. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

339.    ACTUAL AND CONSEQUENTIAL DAMAGES. As direct and proximate result of Defendants' wrongful conduct and illegal conspiracy, Plaintiffs have suffered (and continue to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the investments in the

LLCs. Plaintiffs are entitled to recover consequential damages related to lost investments when they were lured into purchasing the investments in the LLCs and the mental anguish they have suffered in connection with these transactions— in an amount to be determined by the trier of fact. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

340.    AUTOMATIC TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c).  Plaintiffs are also entitled to automatic treble damages under 18 U.S.C. § 1964(c) for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

341.    TRIPLE ACTUAL-DAMAGES UNDER NEW JERSEY RACKETEERING ACT. Plaintiffs are also entitled to statutory penalties of triple actual-damages for Defendants' willful, unlawful, deceptive, and fraudulent misconduct described herein with respect to Defendants' marketing and sales to Plaintiffs of shares in the Defendant LLCs, and fraudulent mismanagement of the LLCs and the Underlying Properties.

342.    EXEMPLARY DAMAGES. Defendants' wrongful and unlawful conspiracy to defraud Plaintiffs was actions was committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs are also entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

343.    ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS. Plaintiffs are also entitled to recover their reasonable and necessary attorneys' fees, litigation expenses and court costs, to be determined by the trier of fact.

344.    **TRIAL BY JURY.**  Plaintiff requests trial by a jury of all legal claims herein.

WHEREFORE, Plaintiffs request judgment in their favor and against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses in an amount to be determined by the Court but equaling or exceeding **$9,430,742.12;** treble damages under 18 U.S.C. § 1964(c); statutory triple actual-damages penalties under the New Jersey Racketeering Act; exemplary and punitive damages; and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration, and profits received, directly or indirectly, by Defendants, including the imposition of a constructive trust and the voiding of unlawful transfers; and awarding attorneys' fees and litigation expenses pursuant to 18 U.S.C. § 1964(c), New Jersey Rackeeting Act, and state securities statutes, and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

Dated: July 24, 2025

Respectfully submitted,

/s/H. Jonathan Rubinstein
H. Jonathan Rubinstein (042341992)
THE FEINSILVER LAW GROUP, P.C.
215 Millburn Avenue
Millburn, New Jersey 07041
Tel. 973-376-4400
Fax. 973-376-4405
Attorney for Plaintiffs

&

Nicholas H. Berg (La. Bar No. 33006)
*Pro Hac Vice Forthcoming*
SECURITIES ARBITRATION LAW GROUP
1100 Poydras Street, Suite 2200
New Orleans, Louisiana 70163
Telephone: (504) 688-4402
Fax: (504) 587-1577
Email: nick@berglaw.us
Attorney for Plaintiffs